HON. J. G. TALIAFERRO, ⎫
HON. R. K. HOWELL,   |
HON. W. G. WYLY,     ⎬ *Associate Justices.*
HON. W. W. HOWE,     ⎭

No. 2508.—THE STATE OF LOUISIANA, ex rel., S. BELDEN, Attorney General, *v.* WM. FAGAN, et al.

The State has the right to restrain, by injunction, persons who have combined together for the avowed purpose of doing what is prohibited by law, and also to prevent such persons from interfering with her agents in the execution of the legislative will. And the Attorney General of the State is the proper officer to institute proceedings against such persons.

Courts are not permitted to go behind an enrolled, duly authenticated and promulgated public statute to inquire into the motives which may have influenced the members of the General Assembly in enacting it. Therefore, evidence tending to establish bribery and corruption against the members of the General Assembly, which, is alleged, procured its passage, is not admissible.

Article 66 of the Constitution provides that the Governor shall return all bills which he does not approve, with his objections thereto, to the House in which they may have originated, in five days from the day of presentation, except where such return is prevented by an adjournment. In that case the Governor is required to return all such bills as he does not approve, on the first day of the next General Assembly. Held—That by this article of the Constitution, the Governor has until the meeting of the next General Assembly to deliberate as to whether he will approve or disapprove any bill that has passed less than five days before adjournment, and in case he approves any bill thus situated, he may sign it at any time before the meeting of the next General Assembly, and such act becomes a law from the moment he signifies his approval by affixing his signature thereto.

69

State ex rel. Belden, Attorney General, v. Wm. Fagan et al.

In all matters of a purely legislative character, the Legislature is supreme, in all respects, except when restricted by the Constitution of the State, or the United States. As a legislative body, they form and constitute an independent, co-ordinate branch of the Government, and are in nowise under the control or supervision of the judiciary department.

Objections that the charter parties, in a charter granted by the State, have not completed the works within the time specified in the law, can only be urged by the State, in a suit by the State to have the charter forfeited. They can not be urged by third parties in a suit brought by the State to restrain them from interfering with her agents in the enforcement of the law.

The designating of the place or places where the slaughtering of animals shall be done, and prohibiting their slaughter at other places, falls within the police powers of the State. Whatever the State can lawfully do itself, it can do through the agency of a corporation. Therefore, the State, through the action of her Legislature, can make whatever police regulations may be necessary to preserve the public health, and can create, by the same authority, a corporation through which the police regulation prescribed by her may be enforced.

The act of the Legislature of 1869, No. 118, entitled "An Act to create the Crescent City Live Stock and Slaughterhouse Company," while it gives to said company the exclusive right to keep a slaughter house, and also the exclusive control and supervision over the inspection of all animals slaughtered for market in the city of New Orleans, yet it does not prohibit or exclude any person from the business of purchasing or butchering live stock, and selling the meat in the markets of the city. It only requires persons engaged in the business of slaughtering, etc., to comply with the police regulations prescribed by the law. Therefore, this act is not a violation of Article I, Section 2 of the bill of rights in the State Constitution, which provides that all persons shall enjoy the same civil, political and public rights and privileges. Nor is it in violation of the fourteenth amendment to the Constitution of the United States.

The designation, in the act of 1869, No. 118, of the places or wharves at which all live stock shall be landed from steamboats, is not a regulation of commerce between the States, and is not, therefore, a violation of the laws or Constitution of the United States. This provision of the law comes strictly within the police powers of the State, and is therefore legal.

APPEAL from the Fifth District Court, parish of Orleans. *Leaumont, J. S. Belden,* Attorney General, *Randall Hunt, C. Roselius, W. H. Hunt* and *Joseph P. Hornor,* for relators, appellees. *Fellows & Mills, Campbell, Spofford & Campbell* and *Cotton & Levy, E. Bermudez* and *Cooley & Philips,* for defendants and appellants.

LUDELING, C. J. This suit is instituted by the Attorney General, in the name of the State of Louisiana, against the Live Stock Dealers' and Butchers' Association of New Orleans, to prevent the said pretended corporation from doing any of the acts, or executing any of the purposes, for which said corporation was organized, because the said acts and purposes are prohibited by the statute of the State of Louisiana, entitled " An Act to protect the health of the city of New Orleans, to locate the Stock Landing and Slaughterhouses and to incorporate the Crescent City Live Stock Landing and Slaughterhouse Company," approved on the eighth of March, 1869. The defendants filed the exception of *lis pendens.* The plea was correctly overruled. The *objects* of the suits were not the same.

In their answer the defendants deny the right of the Attorney General to bring this suit; and they allege that the act of the General Assembly, No. 118, of 1869, is unconstitutional.

It is admitted that, for the purpose of erecting slaughter houses and

establishing stock landings, etc., the defendants have leased, with the intention of ultimately purchasing of Charles Cavaroc, a tract of land situated within the territorial limits in which the act No. 118 prohibits every one, except the Crescent City Live Stock Landing and Slaughter House Company, from erecting slaughter houses and establishing stock landings, etc.

Article second of the act of incorporation, under which the defendants claim to act, declares that the object or purpose of the organization of the company is to do what the act No. 118 forbids.

The State has the right to restrain, by injunction, persons (who have joined themselves together for the avowed purpose of doing what is prohibited by law), from carrying into effect their unlawful purposes, and from interfering with her agents in the execution of the legislative will. And the Attorney General is expressly directed to institute proceedings to prevent persons from unlawfully acting as a corporation, by the first section of an act entitled " An Act providing a remedy against usurpation, intrusion into, or the unlawful holding or exercising a public office or franchise in this State." Section one of act No. 58 of 1868, p. 71.

We are of opinion that the evidence offered to prove "deception, fraud, bribery, corruption," etc., against the members of the General Assembly was correctly rejected by the district judge. The allegations were too vague and indefinite to admit of proof. See Rooks v. Williams, 13 An. 374; 12 An. 13; Lonaillier v. Castille, 14 An. 777; 9 An. 54; 7 An. 239, Landry v. Dickson.

The constitutionality of the act of eighth March, 1869, No. 118, is involved in the cases numbered 2504, 2505, 2506, 2507, 2508 and 2509, submitted to us; and as they, collectively, present for decision all the objections urged against the validity of the act, in upwards of two hundred cases now pending in the district courts of the parish of Orleans, and as there is a written consent to that effect, we will proceed to pass upon the questions presented in the several records, as if they were in one case.

The act No. 118 is said to be unconstitutional, for the following reasons :

*First*—Because it is " an act for the emolument of private individuals," and that "certain persons, supposed to be combining and conspiring together for the purpose of unlawful gain, and with the specious, but false, pretense of protecting the health of the city of New Orleans, did, by deception, fraud, bribery, corruption and unlawful means, procure the passage of an act through the Legislature of the State of Louisiana," entitled " An Act for the protection of the health of the city of New Orleans," etc.

It is unnecessary to decide whether a private statute of the General Assembly may be impeached for fraud in the grantees, for we are of

opinion that the act No. 118 is not a private act. "There is a material difference between public and private statutes, and the books abound with cases explaining this distinction in its application to particular statutes. It is sometimes difficult to draw the line between a public and private act. Generally speaking, statutes are public, and a private statute may rather be considered as an exception to a general rule. It operates upon particular individuals, or upon private persons. It is said not to bind or include strangers in interest to its provisions, and they are not bound to take notice of a private act, even though there be no general saving clause of the rights of third persons. This is a safe and just rule of construction, and it was adopted by the English courts in very early times, and does great credit to their liberality and spirit of justice." It is supported by the opinion of Sir Matthew Hale, in Lucy v. Livingston, 1 Kent., p. 459. "Private statutes are placed under another limitation. The courts of justice are bound, ex officio, to take notice of public acts without their being pleaded, for they are part of the general law of the land, which all persons, and particularly judges, are presumed to know; but they are not bound to take notice of private acts, unless they be specially pleaded, and shown in proof, by the party claiming the effect of them." 1 Kent., p. 460. The act No. 118 was passed in the interest of the public, its provisions are general, and are binding upon all persons, and, therefore, it is a public statute.

And we are of opinion that courts are without warrant in law to go behind an enrolled and duly authenticated and promulgated public statute to inquire into the motives which may have influenced or actuated the members of the General Assembly in enacting laws. Otherwise, the legislative department would cease to be a co-ordinate branch of the government. It would be completely subordinate to the judicial department. Fletcher v. Peck, 6 Cranch, 87; 8 Indiana Rep. 298, Wright v. Defrees; 7 An. Law Reg. 158, Sunbury and Erie Railroad Company v. Cooper.

*Second*—The bill was signed after the Legislature had adjourned. Does the constitution prohibit this? Article 66 provides that "every bill, which shall have passed both Houses, shall be presented to the Governor. If he approve, he shall sign it; if he do not, he shall return it, with his objections, to the House in which it originated. If the bill shall not be returned by the Governor within five days after it shall have been presented to him, it shall be a law in like manner as if he had signed it, unless the Legislature, by adjournment, prevent its return, in which case the bill shall be returned on the first day of the meeting of the General Assembly after the expiration of said five days, or be a law."

The Governor shall sign the bill, if he approve; if he do not, he shall return it to the branch of the Legislature in which it originated.

It is only when he disapprove, that he is required to return the bill to the Legislature. When the General Assembly is in session, he is allowed five days in which to determine whether he will sign the bill or veto it. If the General Assembly adjourn before the expiration of the five days, he is then allowed until the first day of the next General Assembly in which to decide whether he will veto or approve the bill. We have already seen that article 66 directs that if the Governor approve, he shall sign the bill. We can not believe that this delay was given to the Governor simply to enable him to examine the law for the purpose of disapproving; on the contrary, we believe that the time was granted for the same purposes for which the five days were allowed him during the session of the Legislature, that is, to judge and determine whether he will sign the bill or veto it.

The constitution of California contains this clause, "if a bill shall not be returned by the Governor within ten days, Sundays excepted, the same shall be a law in like manner as if he had signed it, unless the Legislature, by adjournment, prevent such return." And it is contended that the article in the constitution of California, and New York also, is more favorable to the exercise of the right of the Governor to sign a bill, after the adjournment of the Legislature, than article 66 in our own constitution. We do not concur in that view. Those constitutions do not, in terms, expressly or impliedly, confer the right to sign a bill after the adjournment of the Legislature; and in the Twenty-first New York Reports the court held that the Governor *could* sign bills after the adjournment of the Legislature, because the constitution did not expressly or impliedly *prohibit* such an act. The court in California decided that the Governor could not legally sign a bill after the adjournment of the Legislature. We are inclined to the opinion that the New York decision is based upon sound principles and legal reasoning.

But under the constitution of Louisiana, the right may be exercised not only because it is not prohibted, but because the right is delegated in the constitution itself, as we have already stated.

But it is contended that the signing of bills by the Governor is a legislative act, and is " positively prohibited in article 39 of the constitution, after the expiration of sixty days." The article declares "the members of the General Assembly shall receive from the public treasury a compensation, etc. * * * No session shall extend beyond the period of sixty days, to date from its commencement; and any legislative action had after the expiration of said period of sixty days shall be null and void; but the first General Assembly that shall convene after the adoption of this constitution, may continue in session for one hundred and twenty days." It is evident that the terms " legislative action," used in this article, refer to the action of the General Assembly. But if there were any doubt about this, article 66 of the

constitution would explain the ambiguity, for it is expressly declared that the Governor shall, in a certain contingency, return the bill with his objections, to the House in which it originated, on the first day of the next General Assembly.

It is as much a "legislative action" to disapprove a bill, and assign reasons therefor, as to sign it.

A considerable portion of the elaborate brief of the counsel for defendants is devoted to combating the correctness of the views of this court relating to the powers of State Legislatures. After a careful examination of the question, we see no good reason for changing the opinion expressed by us in the case of the State v. Volkman, "that the Legislature, in its sphere, is supreme in all respects, save when restricted by the constitution of the State or the United States; " and which was often enunciated by our predecessors. 9 R. 411; 9 An. 562; 11 An. 308, 338, 370; 12 An. 169, 554.

The accepted theory seems to be this: In every sovereign State there resides an absolute and uncontrolled power of legislation. In Great Britain this complete power rests in the Parliament; in the American States, it resides in the people themselves, as an organized body politic. But the people, by creating the constitution of the United States, have delegated this power, as to certain subjects, and under certain restrictions, to the Congress of the United States, and that portion they can not resume, except as it may be done through amendment of the national constitution.

For the exercise of the legislative power, subject to this limitation, they create, by their State constitution, a legislative department, upon which they confer it; and, granting it in general terms, they must be understood to grant the whole legislative power which they possessed, except so far as at the same time they saw fit to impose restrictions. Cooley's Constitutional Limitations, 87. Mr. Chancellor Kent said: "The principle in the English Government that the Parliament is omnipotent, does not prevail in the United States; though, if there be no constitutional objection to a statute, it is, with us, as absolute and uncontrollable as laws flowing from the sovereign power under any other form of government." 1 Kent, 448; 16 Georgia Report, 113.

We believe the rule, stare decisis, should control us in questions of this kind. "Misera est servitus ubi jus est vagum aut incertum."

*Third and fourth*—The objection, that the works were not completed within the time specified in the law, and that the charter of the Crescent City Live Stock and Slaughterhouse Company was forfeited by the failure, can not be urged by the defendants. The State alone had the right to have the charter forfeited. In the petition of the State, it is admitted that the works were completed; and we think the evidence in the record justified the admission.

State ex rel. Belden, Attorney General, v. Wm. Fagan et al.

*Fifth*—It is urged that the act is violative of the bill of rights, incorporated in the constitution of this State in 1868, and the fourteenth constitutional amendment of the United States, because it deprives "one class of citizens of certain rights of property and freedom of action, not for the good of the community, but for the private gain of other individuals in the community."

This proposition assumes that one class of persons is deprived of certain rights of property for the private gain of individuals.

This assumption is unwarranted by the record and contemporaneous history. The facts which necessitated the passage of the act No. 118, or some similar law, were succinctly stated in the oral argument of the distinguished counsel who closed the discussion. "When this city was under the government of the Cabildo, and afterwards, under the government of the charter of 1804, the population was comparatively small—only a few thousand inhabitants. Yet they found it necessary to regulate the slaughtering of animals whose meat was intended to be sold in the market of the city, and a place was assigned for the purpose at or below the point where the Slaughterhouse is established at this time by the act of the Legislature. * * * Things continued under this regulation for a long time; but our population increased, and as the Americans came in more vigor was exhibited in the government of the State and city. The population, at first, chiefly settled and concentrated in what is now the lower part of the city. * * *

"The butchers, who had been carrying on their business quite conveniently from the opposite side of the river, below the city, began to find the situation inconvenient. * * * They determined to move to the upper part of the city and to slaughter there the animals whose meat they sold; and this they did, to the annoyance and injury of the public. After the lapse of some time a series of municipal ordinances were passed upon this subject. They were entitled, 'Ordinances for the protection of the health of the city and to guard against public nuisances.' They provided that no beef should be slaughtered except in slaughterhouses, and that the head and entrails, the offal and other refuse parts of the animals, etc., should be taken away and thrown into the river, at a point below the city. * * * Population and business continued to increase, and move upwards, and the butchers again found it convenient and advantageous to move up. They went, as the enactments show, to the City of Jefferson, where they have landed their cattle on the banks of the river, put and kept up pens, slaughtered animals, throwing the offal, etc., into the river, and established and kept up a constant source of nuisance and annoyance to the community, injurious and dangerous to the health, the limbs and lives of the citizens. * * * Two or three hundred beeves, arriving almost daily, for the purpose of being slaughtered for the New Orleans market, were landed at the foot of Louisiana avenue.

Persons passing along the levee and the streets adjoining the landing, in a densely populated part of the town—watching invariably with fear or anxiety—were continually inconvenienced by these untamed animals, sometimes breaking loose and rushing wildly and madly through the streets, endangering the limbs and the lives of men, women and children."

Grand juries reported against this state of things as a public nuisance and called upon the Municipal Council of New Orleans to exercise its police powers and correct the evil, and the Council did pass ordinances for that purpose.

In 1866, the grand jury of this city presented to the district court this important subject. They stated that: "In consideration of the prevalence of cholera and other diseases in our midst, the grand jury makes a special report upon the impurity of the water taken from the river, and supplied by pipes to the city, caused by throwing offal, refuse from slaughterhouses, etc., into the river, above the Water Works Company, at the foot of Richard street. The superintendent of the water works states that the suction pipes of the river occasionally become clogged by such matter being drawn into them, requiring constant attention to keep their orifices clear. Two large vessels lie at the wharves, immediately above and in front of the suction pipes, and act as fenders to guide the floating offal, etc., out into the current. When they have been loaded and gone, the collection of effete matter will naturally increase, as in an eddy. How many slaughterhouses exist above the works, I can not say, but their entire removal to the lower part of the city would be a public benefit. A petition signed by more than five hundred of our most prominent citizens for such removal of slaughterhouses was addressed to the Council last spring, and reported upon favorably by the Committee on Police and Health of the lower board, June 12, 1866; but the resolution submitted by them failed to become a law, and the city passed, on the thirty-first of July, 1866, an ordinance, No. 233, N. S., authorizing the erection of slaughterhouses in the Fourth District, although, under the health ordinance (section 26), they are expressly forbidden. Every diligence is exercised now to keep the suction pipes clear from all effete substances, and after the water is pumped into the reservoir, a laborer is engaged throughout the day in skimming the scum which forms upon the surface.          *          *          *          *

Many persons of this city (especially the poorer classes, amongst whom most of the deaths of cholera have lately taken place), use the hydrant water for drinking and other purposes.   *   *   *   We recommend that the city authorities should take this matter into immediate consideration, and that, besides adopting requisite ordinances, they should petition to the Legislature to pass an act that there should not

be allowed to exist any slaughterhouses, or similar places, above the city within a specified number of miles. We consider such an act of legislation necessary, because should the city authorities cause the removal of such establishments from the upper portion of the city, they could be re-established barely above the city limits, and would be as great nuisances then and as now."

In the year 1867, the State Legislature passed an act entitled " An Act to prevent offal and nuisances from being thrown in the Mississippi river, within the limits of the cities of New Orleans and Jefferson." And to enforce obedience to this command, the act declared that no ordinance of either Council should have force until that ordered by this act should be passed—but this law was disregarded.

Again, from the journal of the House of Representatives, of 1868, it appears that the following bill was brought in : " An Act to protect the health of the city of New Orleans and the town of Algiers," etc. It was read and referred to a committee, who reported, "from personal and careful observation," " from the opinions of persons thoroughly competent to judge on the question," as well as " from a petition signed by eleven hundred respectable property holders of New Orleans, urging the removal of the foul nuisance," that " the immense quantity of filth and offal which is accumulated at and in the vicinity of the stock landing," "goes into the Mississippi river, which, if not prejudicial to health, is certainly very revolting. The immense suction pipe of the New Orleans water works is immediately below, and sucks in objects floating on the water, at a distance of fifty or sixty feet. When the river is low, it is not uncommon to see intestines and portions of putrified animal matter lodged immediately around the pipes. The liquid portion of this putrified matter is sucked into the reservoir. Vessels arriving here with cattle, especially those that have been in a storm, invariably throw the dead cattle—of which they often have many—into the river at the stock landing. These are again taken from the river and subjected to the process of skinning, after which the carcass is again thrown into the river. It is not unusual, during the sultry heat of summer months, to see these floating objects about the shipping, no doubt causing disease among the sailors on board these vessels. There is not the slightest doubt in the minds of your committee that this must be extremely prejudicial to the health of New Orleans."

To this report is appended a certificate from the President of the Board of Health, J. S. Smith, Dr. Choppin and J. T. Pennington corroborating the conclusions of the committee, and recommending the removal of the stock yards, landings, sale stables and slaughterhouses below the city.

With these historical facts before us, we are not at liberty to presume that the General Assembly were guilty of falsehood and deceit when

they declared in the title to the act in question, that the object of the law was "to protect the health of the city of New Orleans," etc. It can not be seriously questioned that the General Assembly possessed the power to legislate upon the subject; it comes clearly within the police powers of a State. We have seen, that, in the opinion of grand juries, of private citizens and of legislators, the location of the stock landing and slaughterhouses in the city was injurious to the health, comfort and safety of the inhabitants, and demanded legislative action.

Does the act of 1869 cease to be a police regulation because it locates the stock landing and slaughterhouses elsewhere, and creates a corporation as a means to carry out the legislative will?

We think not. The members the General Assembly were the sole judges as to the instruments by which they should enforce their police regulations. "What the State can do itself, it can do through a corporation." 11 An. 371.

To protect the health of the city of New Orleans, the Legislature provided that, from and after the first day of June, 1869, it shall not be lawful to land, keep or slaughter any cattle, beeves, calves, sheep, swine, or other animals, or to have, keep or establish any stock landing, yards, pens or slaughterhouses, at any point or place within the city of New Orleans, or the parishes of Orleans, Jefferson and St. Bernard, or at any point or place on the east bank of the Mississippi river, within the corporate limits of the city of New Orleans, or at any point on the west bank of the Mississippi river, above the present depot of the New Orleans, Opelousas and Great Western Railroad Company, except that the Crescent City Live Stock Landing and Slaughterhouse Company may establish themselves at any point or place hereinafter provided. The corporation is then created, with certain privileges and obligations. The company is required to build, at its own expense, a grand slaughterhouse or abattoir, of sufficient capacity to accommodate all butchers, and in which to slaughter five hundred animals per day; also a sufficient number of sheds and stables to accommodate all the stock received at this port; all of which was to be completed by the first of June, 1869. They were also authorized to build landing places for stock, etc.

Having prohibited the slaughtering of animals, and the landing of stock, within the limits where such business had been conducted, it was eminently proper that the General Assembly should provide places with suitable conveniences for the butchers and dealers in live stock to carry on their business, without interruption. This the Legislature did, through the agency of a corporation.

The statute in question requires the Governor to appoint a competent person as inspector, whose duty it is to examine all animals

intended to be slaughtered, to ascertain if they be sound and fit for human food. It seems to us that the establishment of one grand abattoir would greatly facilitate the inspection of animals, and the attainment of the objects contemplated by the law. It is not an unreasonable presumption that the General Assembly exercised their power wisely. At all events, it was the exercise of a discretion vested in them, and we, as judges, can not arrogate to ourselves the right to correct their errors, in matters within their control.

"The police powers affect the use and enjoyment of property. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise. It extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State, etc. By this general police power of the State, persons and property are subject to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State, and of the perfect right of the State to do which no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned." 2 Kent, 432.

We are gravely told that this act infringes the liberty of the citizen and the freedom of the use of property, and that, therefore, it is a violation of the bill of rights in the constitution of the State of Louisiana, as well as of the fourteenth amendment of the constitution of the United States!

We think that is a fallacy. Liberty is the right to do what the law permits. "Freedom does not preclude the idea of subjection." On the contrary, it presupposes the existence of some legislative provision, the observance of which insures freedom to one, by securing the like observance from others. But the act of eighth of March, 1869, does not prevent butchers from following their trade; every one who wishes may butcher, subject only to the regulations of the law. There is nothing unconstitutional in that. In the case of Morand v. Mayor et al., 2 La. 218, the district court charged the jury that the city had the right to prevent the sale of sound oysters by individuals on their private property. To this opinion the plaintiff took a bill of exceptions. Judge Martin, who was the organ of the court, said: "It appears to us the district court did not err. The City Council has the power to establish markets, and to provide for the cleanliness and salubrity of the city. In establishing markets, they designate certain spots or places for the sale of certain articles of provisions; in doing so * * * they facilitate the inspection of provisions; and by hiring the stalls they raise money to defray the expenses of building market houses, and pay the salaries of officers they appoint to prevent the sale of unsound provisions. * * * It appears they have established several stands on the levee for the sale of oysters, and they

farm out these stands. The ordinance prevents the keeping of heaps of oysters elsewhere than in these stands. In this case the salubrity of the city seems to have been considered by the Council."

But it is said that the Crescent City Live Stock Landing and Slaughterhouse Company alone can keep a slaughterhouse within the limits designated. That is true.

But, "there are, unquestionably, cases in which the State may grant to specified individuals, privileges, without violating any constitutional principle, because, from the very nature of the case, it is impossible that they be possessed and enjoyed by all; and if it be important that they should exist, the proper State authority must be left to select the grantees. Cooley's Constitutional Limitations.

This right has often been recognized by this court. 15 La. 413, New Orleans and Pontchartrain Company v. Orleans Navigation Company; 10 An. 741; 11 An. 256: 3 An. 639; 9 R. 411.

*Sixth*—It is contended that the act is unconstitutional because it prescribes that cattle, horses, etc., shall be landed at a particular part of the bank of the Mississippi river, and that the owners shall pay for the facilities afforded them in the wharves erected there, and that the act of Congress of the eighth of April, 1812, by which the Mississippi river, etc., is declared to be a common highway, free from imposts, tolls, etc., and article 446 of our Civil Code, conferred the right on every one to land and unload his vessels on its banks without charge.

This question is not a new one. It has been repeatedly decided both by this court and by the Supreme Court of the United States adversely to the views of the defendants. In Gibbon v. Ogden, 9 Wheaton 1, Chief Justice Marshall said: " The inspection law, quarantine laws, health laws of every description, laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, etc., are not in the exercise of a power to regulate commerce, within the language of the Constitution." In the case of the owners of brig James Gray v. Owners of ship John Fraser et al., Chief Justice Taney said: " The local authorities have a right to prescribe at what wharf a vessel may lie and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor, and for what time, and what description of light she shall display at night to warn the passing vessels of her position, and that she is at anchor and not under sail.    *    *    *    *    *    *

" And there is nothing in the regulations referred to in the port of Charleston which is in conflict with any law of Congress regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States." 21 Howard 187; 11 Peters 143; Worsley et al. v. The Second Municipality of New Orleans, 9 Rob. 332; 11 M. 323.

State ex rel. Belden, Attorney General, v. Wm. Fagan et al.

After an earnest and careful examination of all the objections urged against the validity of the act of the General Assembly passed in 1869, and numbered 118, we have come to the conclusion that the law is not obnoxious to any constitutional objection. We need hardly add that acts of the General Assembly are not only presumed to be constitutional, but that the authority of courts to declare them void will never be resorted to, except in a clear and urgent case, one which requires no nice critical acumen to decide on its character, but which is obvious to the comprehension of any person. 21 An. 694; 6 Cranch, 126; Fletcher *v.* Peck ; 12 Wheaton, 270, Ogden *v.* Saunders.

It is, therefore, ordered, adjudged and decreed, that the judgment of the district court be affirmed, with costs of appeal.

---

I concur in the decree pronounced in this case.

W. W. HOWE.

---

TALIAFERRO, J., *concurring*. There is no express provision of the constitution, national or State, prohibiting the Legislature from conferring exclusive privileges upon a corporation. The inhibition is sought for in the bill of rights introduced into the constitution of Louisiana. In title one, article two, of the constitution of 1868, it is declared that the citizens of this State " shall enjoy the same civil, political and public rights and privileges, and be subject to the same pains and penalties." As an abstract general proposition, this is true. But in contemplating this proposition, we should not lose sight of the fundamental principle forming the basis upon which constitutions themselves rest. This controlling principle, when brought into action, often modifies and limits the proposition which asserts a constant, unlimited and perfect equality of rights and privileges. What is this paramount principle ? It is that the will of the people is the source, and the happiness of the people the object, of all legitimate government. As a corollary, it follows that the general welfare should be provided for, even by the sacrifice of that of an individual, if circumstances require it. Each individual, on entering into a society to be governed by laws, yields a part of his natural liberty to secure the remainder, and consents to postpone his own rights when they become antagonistic to those of the great body of the community to which he belongs. The law of expropriation is an example of the working of this principle. The partition of the shore of the Mississippi river, in front of New Orleans, and the appropriation of each portion to a distinct class of vessels and water crafts, is an infringement of that part of our State constitution just referred to, and of the recognition in article four hundred and forty-six of the Civil Code, of the right of every one freely to land his vessel anywhere on the shores of the river.

State ex rel. Belden, Attorney General, v. Wm. Fagan et al.

The abstract equal right of the steamboatman or raftsman to land his steamboat or raft within the district assigned to steamships is violated by the monopoly given of that portion of the shore to owners and navigators of steamships. The sacrifice of the individual right in this case is of no consequence, in view of the general benefit and commerce of a great commercial community; yet it *is* an infringement of that abstract equal right declared in our State constitution.

The doctrine, then, is elementary and well established, that in the public interest and for the public good, legislation which postpones the interests of a few to that of a whole community, is legitimate and proper. The law under consideration, known as the Slaughter House act, I consider a public statute and enacted for the public weal. It relates to an object of the very highest importance—the health of the people. It prescribes sanitary regulations, which the Legislature thought proper to adopt. With the policy or impolicy of these regulations the judicial department has nothing to do. It will not consider the propriety or expediency of the measures resorted to by the law maker. If, in the adoption of means deemed appropriate for carrying out the objects of the law, it was thought advisable to incorporate a company with certain privileges, and the privileges thus conferred affect adversely the interests of a few, that is no ground for declaring the law unconstitutional and void.

———

WYLY, J., *dissenting.* I can not concur in the opinion of the majority of the court on the question of monopoly presented in these cases.

Under the previous constitutions of this State, an act could have but one object, and that had to be embraced in its title; but under the constitution of 1868, organizing the Legislature which adopted the act of the eighth March, 1869, (act No. 118), now under consideration, a statute may embrace distinct or different laws, provided only that the objects thereof be contained in the title. In other words, legislation on different subjects may be embraced in one act, provided the title contains its several objects. The act before us, entitled " An Act to protect the health of the city of New Orleans, to locate Slaughter Houses, and to incorporate the Crescent City Live Stock Landing and Slaughterhouse Company," in my opinion, contains both a public law and a private statute; a public law, in so far as it seeks to protect the health of the city of New Orleans, by requiring the landing and slaughtering of animals below the city, and prohibiting it above; a, private statute, in that it incorporates the " Crescent City Live Stock Landing and Slaughterhouse Company," and gives to it certain sole and exclusive rights and privileges for a certain period. As to the former object, the act is an exercise of police power, and that far, a public law; as to the latter, it is merely a contract between the State

State ex rel. Belden, Attorney General, v. Wm. Fagan et al.

and the juridical person it creates, "the Crescent City Live Stock Landing and Slaughterhouse Company." My objection is to that part of the act which is clearly a private statute, wherein a monopoly is given not necessary to the public health, abridging the freedom of trade and labor, for the gain of a private corporation.

While the Legislature had the right to change the place of landing and slaughtering of animals from the place where it has heretofore been conducted to a locality elsewhere not deleterious to public health and safety; while for sanitary reasons, it had the right to compel the butchers to abandon the locality where their slaughterhouses are situated and to conduct their occupations at another locality less deleterious, imposing this limitation upon their natural rights for the public good, justifiable only by the necessity, it had not the right to create this monopoly in favor of the Slaughterhouse Company, giving to it for twenty-five years the sole and exclusive right and privilege to keep stock landings and slaughterhouses in the parishes of Orleans, St. Bernard and Jefferson, embracing at least half the population of the State. It had no right to place unnecessary restrictions upon labor, to compel the numerous persons pursuing the occupation of butchers to repair to the premises of the Slaughterhouse Company and there pay tribute to it for the privilege of pursuing their usual occupation or earning their living.

As the public health required another location for the purpose of slaughtering animals for market, the act to that extent was law, but where it creates the monopoly, where it imposes upon labor a restriction not necessary, where it compels a large class of the citizens to pursue their occupations only in the premises of the Slaughterhouse Company, and to pay to it a contribution, it is, in my opinion, a measure not necessary to protect the public health of the city of New Orleans, it is not a legitimate exercise of police power and it is a flagrant violation of the bill of rights contained in the constitution.

If the butchers had built their slaughterhouses below the city instead of above it, and were there pursuing their occupation, there would have been no necessity for the act, at least for sanitary reasons; there would have been no necessity to make the application of police power or to place the limitation upon the occupation of these citizens. Now if the public health requires these slaughterhouses to be below the city instead of above it, a law to accomplish only this object would be a legitimate exercise of police power. Whatever legislation is necessary for the public health must be endured by these citizens, however detrimental to their individual interests, but legislation beyond this legitimate purpose, imposing restrictions upon their occupations in favor of a private corporation, violates their civil rights, their liberty, their property, and their pursuit of happiness, to secure which the goverment was instituted.

The slaughtering of animals, and preparing the meat thereof for market, is an ancient occupation in this commonwealth, many citizens earning their living by pursuing this art or business; it is a lawful business, and one which can not be restrained, except so far as public safety, health or necessity may require. The inherent right of the citizen to this occupation, as to all others that are lawful, can only be infringed upon or restricted in so far as public necessity may demand, and no further. Under the bill of rights incorporated in our constitution, all men are free and equal; "they shall enjoy the same civil, political and public rights and privileges, and be subject to the same pains and penalties," Under this private statute the juridical person created by it is endowed with greater rights and privileges than other persons in the pursuit of this ancient occupation, and is not subject to the same restrictions, " pains and penalties " as are imposed upon other persons pursuing the business of butchers.

If it does not endanger the public health for the Slaughterhouse Company to carry on the business of butchers in the localities prescribed in the act, how would it endanger the public health for other persons, in the same localities, to pursue, independently, the same avocation? Can we say the private statute before us does not violate the bill of rights in the constitution, where it gives to a juridical person created by it, greater rights and privileges in the pursuit of an ancient occupation than it does to other persons, and where, under "pains and penalties," it prohibits a large class of persons within the limits of three parishes, embracing half the population of the State, from the slaughtering of animals, which is their occupation, unless they do so at the slaughterhouse of this private corporation, and pay to it a contribution for each animal they may slaughter? Can we say there is equality before the law, where the many are forced to serve the few—where labor is forced to pay tribute to this gigantic monopoly?

But it is said that, as the Legislature had the right, for sanitary reasons, to confine the business of slaughtering animals to certain limits, or inasmuch as they can protect the public health by the exercise of police power, they are the sole judges of the means to accomplish the object, they are the sole judges of the legitimate exercise of their police power.

As a means of public health, they can undoubtedly prohibit the exercise of a lawful occupation in certain localities, and designate others in which it may be pursued; but under the pretext of accomplishing an object coming under the exercise of police power, they can not accomplish another object not coming strictly under that power infringing upon the rights of the people guaranteed by the constitution.

They can not accomplish an unconstitutional purpose; they can not give validity to an unconstitutional private statute by embracing it in an act containing a legitimate object and a valid public law. An unconstiutional law is the same, whether it stands alone in a separate act, or whether it is is embraced in the same statute with another law which is valid and constitutional.

In the statute before us I see two separate and distinct objects and two separate and distinct enactments; one which is right and constitutional, and one which is wrong and unconstitutional. The creation of this monopoly is in no manner necessary to promote the public health. That object would be accomplished without it, just as well as with it. All the public health required was that the slaughtering and landing of animals should be prohibited above the city and permitted below it. The moment the business was prohibited above, and a locality designated below, public necessity ceased to have further demands in the premises. The right to impose this monopoly can not be successfully maintained upon sanitary grounds, for it was not a measure necessary to protect the public health.

But it is said, as to police power, whether exercised right or wrong, the Legislature alone can decide; that the courts can not interfere with them in the application of that power

To my mind the police power, like all other powers confided to the Legislature, is not unlimited; that may be abused as other powers are sometimes abused. The Legislature can no more be the sole and exclusive judge of the extent of its police power than it can be of the extent of the other powers of legislation delegated to it by the people, in whom the sovereignty is invested. If the legislators were the sole and exclusive judges of the extent of their powers, their will would be omnipotent, there being no difference between the possession of all power, and being the sole and exclusive judge of the amount of power one believes himself entitled to exercise.

The judicial department was intended to protect the constitutional rights of the people, whether assailed by an enactment springing from the wrongful exercise of the police power or any other power. If the constitution has been violated, as I think, in creating this monopoly to that extent, the act before us is not law, and it is not only the right but the duty of the court so to declare.

The citizen has no greater property than the freedom of trade and labor; it can not be taken for private purposes, but only under public necessities and for public uses.

"The Legislature has not, by the right of eminent domain, the right to take the property of a person to give to another, not even in police regulations." 3 Paige Chan. N. Y. Rep. 159; 8 Wendell 85.

" The Legislature is not the sovereignty of the State, but only one of the organs of the sovereignty, and a restricted organ in regard to

State, ex rel. Belden, Attorney General, v. Wm. Fagan et al.

all matters prescribed by the constitution. · It is prohibited to the government, even in its sovereign capacity, to take private property, except for public use.   *   *   *   But happily for us, the Legislature is not the creator or the judge of its own powers, but it is the creature of the constitution, and all its acts must be submitted to it." 18 Wendell, N. Y., 56, 61, 63.

I think the vast array of authorities, both English and American, presented with such consummate ability by the counsel in behalf of the Butchers' Benevolent Association, fully maintains the view I have taken of the subject of monopoly presented · in these cases, and I, therefore, feel constrained to dissent from the opinion of the majority of the court.

Rehearing refused.

Mr. Justice Howell, absent.

Note.—This case is now pending on a writ of error to the Supreme Court of the United States, at Washington, granted by Mr. Justice Bradley, of that tribunal, on application of defendants, on the question of the validity of the act incorporating the Crescent City Live Stock and Slaughterhouse Company, under the fourteenth amendment to the Constitution of the United States.