CITY OF DETROIT v. CHAPIN.

1. CONSTITUTIONAL LAW—ENACTMENT OF STATUTE—ADJOURNMENT
   OF LEGISLATURE—AUTHORITY OF GOVERNOR TO SIGN BILL.

   The Constitution of 1835 provided that, if any bill should
   not be returned by the governor within 10 days, Sundays ex-
   cepted, after it should have been presented to him, the same
   should become a law, in like manner as if he had signed it,
   unless the legislature, by their adjournment, should prevent
   its return, in which case it should not become a law. In the
   revision of 1850, the following clause was added: "The gov-
   ernor may approve, sign, and file in the office of the secretary
   of state, within five days after the adjournment of the legis-
   lature, any act passed during the last five days of the session,
   and the same shall become a law." *Held*, that a bill passed
   previous to the last five days of the session, and approved by
   the governor after the adjournment of the legislature, but
   within 10 days from the time of its passage, became a law.
   GRANT, J., dissenting.

2. STATUTES—REPEAL—EFFECT ON PENDING PROCEEDINGS.

   Act No. 467, Local Acts 1895, entitled "An act to author-
   ize the city of Detroit to take private property for the use and
   benefit of the public," repealed the existing law upon the
   subject, and, no saving clause being contained therein, pro-
   ceedings pending under the earlier act were terminated
   thereby.

*Mandamus* by the city of Detroit to compel William
W. Chapin, judge of the recorder's court of Detroit, to
vacate an order quashing certain proceedings instituted by
relator under the general act authorizing cities and vil-
lages to take private property for the use and benefit of
the public, said order having been made upon the theory
that the act mentioned had been repealed, so far as it was
applicable to the city of Detroit, by Act No. 467, Local
Acts 1895. Submitted November 5, 1895. Writ denied
December 31, 1895.

*John J. Speed*, for relator.

*John G. Hawley*, for respondent.

By permission of the court, briefs were also filed by *Hanchett & Hanchett* and *B. F. Graves*, on behalf of the Regents of the University, and by *E. F. Sawyer*, in support of relator's contention upon the constitutional question, and by *F. H. Dodds*, in support of the contention of respondent.

HOOKER, J.    This case involves the question of the validity of an act of the legislature passed previous to the last five days of the session, and approved by the governor after the adjournment of the legislature.    Its determination depends on a construction of section 14, art. 4, of the Constitution, which reads as follows:

"Every bill and concurrent resolution, except of adjournment, passed by the legislature, shall be presented to the governor before it becomes a law.    If he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it originated, which shall enter the objections at large upon their journal, and reconsider it.    On such reconsideration, if two-thirds of the members elected agree to pass the bill, it shall be sent with the objections to the other house, by which it shall be reconsidered.    If approved by two-thirds of the members elected to that house, it shall become a law.    In such case the vote of both houses shall be determined by yeas and nays; and the names of the members voting for and against the bill shall be entered on the journals of each house respectively.    If any bill be not returned by the governor within ten days, Sundays excepted, after it has been presented to him, the same shall become a law, in like manner as if he had signed it, unless the legislature, by their adjournment, prevent its return; in which case it shall not become a law.    The governor may approve, sign, and file in the office of the secretary of state, within five days after the adjournment of the legislature, any act passed during the last five days of the session; and the same shall become a law."

This section, with the exception of the five-day provision, was a part of the former Constitution.

. It is contended on behalf of the respondent that, under the previous Constitution, the governor might lawfully sign a bill at any time within 10 days after its passage; that his neglect to return the bill, with reasons for not signing, within 10 days, was equivalent to a signature, unless the legislature, by adjourning, prevented such return, in which case it would not become a law, unless he signed it within 10 days. It will be noticed that the Constitution nowhere fixes a time within which the governor shall sign bills, except as it may be inferred to be 10 days, from the provision that an act shall become a law without signature if 10 days after its passage shall expire during the session. If this inference is not a legitimate one, the conclusion is irresistible that, under the former Constitution, the governor had unlimited time after adjournment within which to sign bills, or that he must sign during the session. If we were construing the provision of the earlier Constitution, we should therefore feel justified in concluding that the governor might sign a bill within 10 days after its passage, though the legislature should have meantime adjourned. We are aware that there are weighty authorities against this construction, notably the carefully considered and elaborately reasoned case of *Fowler* v. *Peirce*, 2 Cal. 165, which appears to have been the earliest case involving the question. On the other hand, many cases have taken a different view of the subject. *People* v. *Bowen*, 30 Barb. 24, 21 N. Y. 517; *Lankford* v. *County Commissioners*, 73 Md. 105; *State* v. *Fagan*, 22 La. Ann. 545; *State* v. *Supervisors of Coahoma Co.*, 64 Miss. 365; *Solomon* v. *Commissioners of Cartersville*, 41 Ga. 157. The Georgia case, however, appears to be based upon the fact of usage. To what extent, if at all, this provision was given a construction by usage previous to 1850, we are not advised. The signing of bills after adjournment has been practiced since.

The constitutional convention which adopted our present Constitution added the last provision to the section as it previously stood, and it is contended that this provision indicates a construction of the former provision by that convention in accordance with the California decision, though that case had not then been decided. This addition is said to indicate an intention to enlarge the power of the governor, by authorizing the signature, within five days after adjournment, of bills passed during the last five days of the session; and it is forcefully argued that the last words of the sentence, "and the same shall become a law," imply that this provision was necessary to give effect to an act not signed or returned during the session. To the claim that the convention added this provision for the purpose of shortening the period for signature after adjournment to five days, it is answered that no good reason is assigned therefor, and that, had that been the design, unambiguous language could easily have been found to express such idea; and, furthermore, that the addition of the words quoted is entirely without significance if that view is to be taken.

If, under the provision as previously existing, a doubt was entertained of the validity of acts signed after adjournment, the convention might well think it best to set the question at rest. In such case, it is apparent that members would be likely to entertain different opinions about the power of the governor to sign bills after the adjournment of the legislature, as well as the time to be allowed for that purpose. Some may have thought that the governor's power was unlimited, and that acts might become laws by virtue of his signature appended at any time after adjournment. Others may have thought the time to be limited to 10 days by the language of the Constitution relating to the return of bills with reasons. Others still may have taken the ground that bills must be signed before adjournment to give them effect. Apparently, the only light attainable was the common practice. The presidents made a practice of signing during the ses-

sion, we are told. On the other hand, the decision in Georgia and that in New York show that it was customary for the governors, in those States at least, to sign after adjournment. As our Constitution followed that of New York literally so far as this provision was concerned, we may reasonably suppose that the practice under it recognized and followed that common in New York. When the subject arose in convention, all may have admitted the necessity of time for signing bills after adjournment. Some may have thought the power existed, though, in view of the fact that it was questioned, have been willing to let the Constitution show it, and to permit a limitation upon what they believed to be the existing rule, as to bills passed during the last five days, to set the question at rest. On the other hand, some may have been unwilling to concede anything unless all bills were to be signed within five days after adjournment. We think, therefore, that it is not clear that the convention had settled convictions upon the question of the governor's power, or that the added sentence was necessarily considered an enlargement. Doubtless, it was by some, while others, believing that it was unnecessary as an extension, may have favored the provision as a limitation, or a compromise which should set the matter at rest.

We discover no reason based upon public policy for saying that the governor should not be permitted to sign bills after the houses adjourn. The strongest argument against it is found in the California case, and this rests upon the proposition that the governor, when approving an act, exercises a legislative function, which, if necessary, may be admitted without also admitting that he must sign before the two houses adjourn. The practice of the presidents has some force, but it is, at best, only negative proof of a construction, and may have been continued if it did not originate from abundant caution to avoid possible consequences. The fact that President Lincoln departed from it even in one instance is of great weight, as it shows that construction to have been disre-

garded by a president whose conception of the powers of
the different branches of government was as broad, and
his observation of them as conscientious, as that of any of
his predecessors; and the action of Congress in re-enacting
the law by way of amendment may have been a precau-
tionary measure, or merely to prevent expensive litigation
by eliminating the question.    Moreover, the Supreme
Court of the United States, in *Seven Hickory* v. *Ellery*,
103 U. S. 423, recognizes the rule as laid down in *People*
v. *Bowen, supra;* and, while the Constitution there
under discussion differed somewhat from the Constitution
of New York and that of the United States, the case was
apparently considered to be within the principle of the New
York, Maryland, and Georgia cases, which, therefore,
may be said to have been approved.    Its logical effect is
to break the force of the presidential precedent upon
which so much reliance is placed.

The last provision of the section, if necessary to confer
a power to sign after adjournment, applies only to the
bills passed within the last five days; but if not necessary
to confer a power, because already existing, it must then
be a limitation; and the question here is whether there is
a necessary implication that the previously existing power
was intended to be removed.    To an extent, we think,
there is.    Clearly, it precludes signing bills passed during
the last five days of the session, after the expiration of
the period of five days after the adjournment.    It is silent
about the power as to other bills, because, under existing
provisions, the signature was restricted to the same period.
No consideration of public policy is urged why the gov-
ernor should not sign bills after adjournment.    The effect
of relator's construction would be to give a bill passed the
fifth day before adjournment the full period of 10 days
within which it might be signed, while bills passed one
day earlier would have but five.    No reason is suggested
for such a discrimination, and to our minds it is more
reasonable that the convention should have supposed that
all bills were to be signed within 10 days after passage,

except those passed during the last five days, which were to be disposed of within five days after adjournment.

"The cardinal rule of construction concerning language is to apply to it that meaning which it would naturally convey to the popular mind, in all cases where the propriety of such construction is not negatived by some settled rule of law." *People* v. *Dean*, 14 Mich. 406, 417.

"Constitutions are to be construed as the people construed them in their adoption, if possible; and the public history of the times should be consulted, and should have weight in arriving at that construction." *Bay City* v. *State Treasurer*, 23 Mich. 499.

"Constitutions, as well as statutes, are to be construed in the light of previous history and surrounding circumstances. The language is not to be measured by mathematical rules merely, but is subject, in the nature of things, to numerous implied exceptions or qualifications." *Kennedy* v. *Gies*, 25 Mich. 83.

"Constitutional provisions must be construed with reference to each other when relating to the same subject-matter." *Root* v. *Mayor, etc.*, 3 Mich. 433; *Dullam* v. *Willson*, 53 Mich. 392.

"The framers of a Constitution are presumed to have a knowledge of existing laws, and to act in reference to that knowledge." *People* v. *May*, 3 Mich. 598, 610.

We are cited to instances where this construction has been given to this section by the governors, and there are numerous acts whose validity depends on the question involved here. If the question were more doubtful than it is, we might properly consider the force of a practical construction of co-ordinate branches of government, acquiesced in by the general public for a long period. In commenting upon this subject, Mr. Justice COOLEY says:

"Great deference has been paid in all cases to the action of the executive department, where its officers have been called upon, under the responsibilities of their official oaths, to inaugurate a new system, and where it is to be presumed they have carefully and conscientiously weighed

all considerations, and endeavored to keep within the letter and the spirit of the Constitution. If the question involved is really one of doubt, the force of their judgment, especially in view of the injurious consequences that may result from disregarding it, is fairly entitled to turn the scale in the judicial mind." Cooley, Const. Lim. (6th Ed.) pp. 83, 84.

He supports it by numerous cases. See, also, *Attorney General* v. *Glaser*, 102 Mich. 409; *Hart* v. *McElroy*, 72 Mich. 453; *People* v. *Maynard*, 15 Mich. 470; *Hovey* v. *State*, 119 Ind. 386; *Biggs* v. *McBride*, 17 Or. 640; *Castro* v. *De Uriarte*, 16 Fed. 93; Cooley, Const. Lim. (6th Ed.) pp. 84–86, and notes; *Stuart* v. *Laird*, 1 Cranch, 299.

Our attention is called to instances where the governors of this State have signed bills under similar circumstances, one as early as 1873, and many since.

Another question needs notice, and this calls for a brief statement of facts. The act in question was "An act to authorize the city of Detroit to take private property for the use and benefit of the public," approved June 4, 1895. Act No. 467, Local Acts 1895. On August 28, 1895, the proceedings in this case were commenced under a former statute. It is now contended that this act terminated the pending proceedings, and the court so held. This, we think, was right. There was no saving clause, and its effect was to repeal the existing law. See *Key* v. *Goodwin*, 4 Moore & P. 341; *Stoever* v. *Immell*, 1 Watts, 258; *Butler* v. *Palmer*, 1 Hill, 324; *Hampton* v. *Com.*, 19 Pa. St. 329; Sedg. Stat. & Const. Law (2d Ed.), 112. The act is materially different from the one repealed by it, and therefore does not fall within the decision in *Moore* v. *Township of Kenockee*, 75 Mich. 332, which was exceptional, and in which the rule above stated is recognized. Id. 340. These proceedings were not pending when the law was passed, being commenced but three days before it took effect.

We conclude, therefore, that the action of the governor

was within his constitutional power, and that the proceedings cannot be prosecuted under the previous statute.

The writ is denied.

McGRATH, C. J., LONG and MONTGOMERY, JJ., concurred with HOOKER, J.

(March 24, 1896.)

GRANT, J. (*dissenting*). When the decision in this case was handed down, I was unable to concur in either the reasons or conclusions reached by my brethren. I had not then had the time to make the investigation which I desired. A more thorough and careful examination than I had then been able to make has confirmed me in my conclusions.

There was some purpose for adding to this section as it stood in the Constitution of 1835 the following clause: "The governor may approve, sign, and file in the office of the secretary of state, within five days after the adjournment of the legislature, any act passed during the last five days of the session; and the same shall become a law." Only three possible purposes can be suggested: (1) The limitation of a power already existing; (2) the removal of any doubt as to the existence of a power; (3) the creation of a power where none before existed, or was believed to exist.

In discussing the question, the following propositions may be laid down as nearly axiomatic:

1. If the Constitution of 1835 conferred the power upon the governor to sign bills after the legislature had adjourned, and it had been so construed by the executive, the legislature, and the people, the amendment to this article in the Constitution of 1850 was without reason, because it conferred no right that did not exist before.

2. If there was doubt about this power under that Constitution, and in the convention some members denied the power, and others affirmed it, it follows that the sole purpose of the amendment was to put the entire question at

rest, and determine just what bills should be signed after adjournment, and fix the time.

3. If the power did not exist under the old Constitution, and it had been so interpreted and acted upon by the executive, the legislature, and the people for 15 years, then the sole purpose of the amendment was to extend the power beyond the day of adjournment, and to limit it as therein provided.

We obtain no light from the report of the convention debates of 1850, for there is no record there of any debate upon this provision. It was reported from the committee early in the session, was finally referred to the committee on phraseology, and changed in one or two immaterial matters. Whichever one of the above propositions is accepted as the true one, the same result, in my judgment, conclusively follows, viz., that no power exists to sign bills after the legislature adjourns, except as provided in this clause. No canon of interpretation permits any other conclusion. The rule, "*Inclusio unius est exclusio alterius*," applies to this case, if to any. I shall, however, I think, be able to demonstrate that the first two propositions are not applicable, and that it must be determined upon the last one.

Prior to 1850, the date of the adoption of the present Constitution, no decision upon this point had been rendered by any court in the United States. The earliest case is that of *Fowler* v. *Peirce*, 2 Cal. 165, decided in 1852, in which it was held that the Constitution of that State, which was in the exact language of the Constitution of the United States and that of 1835 in this State, did not empower the executive to sign bills after the legislature had adjourned. It is there said: "A practical exposition, entirely different from such a construction, has always been given by Congress, and the legislature of every State having similar constitutional provisions." I have not time or material at my command to demonstrate the truth of this statement, even if it were of importance. The

108 MICH.—10.

statement, however, does apply to this State, as an examination of the journals of the legislature discloses. Below is a statement of the number of bills and joint resolutions signed by the governors of this State during the last day of each session from 1835 to 1850: 1835–36, 45; 1837, 32; 1838, 37; 1839, 42; 1840, 34; 1841, 35; 1842, 32; 1843, 27; 1844, 13; 1845, 39; 1846, 16; 1847, 50; 1848, 132; 1849, 55; 1850, 108,—total, 697. Of these, 601 were public acts, and 96 joint resolutions. Many of them, at every session, were passed on the last day. All the governors during the life of that Constitution were lawyers. Some were lawyers of eminence, and had been justices of this court. If it had been supposed that any such power existed, it is certainly strange that the governors did not act upon it, and that no debate upon the question is found in the record of the debates of the convention of 1850. During that time there is a solitary instance of an act being signed after the legislature had adjourned. This was an unimportant local act, being Act No. 89 of the Laws of 1842, entitled "An act to amend an act to incorporate the village of Pontiac." The legislature adjourned upon the 17th of February, and the bill was signed the 27th. I find no explanation anywhere for the delay in signing this bill, or to show when it was presented to the governor. There is no record of the bill except its passage, and the fact that it is found in the office of the secretary of state, signed by the governor, under the apparent date of February 27th. That there was some mistake about it, it is reasonable to suppose. In no other way can we account for the fact that all the other bills were signed upon the day of adjournment, and this one omitted. Whether it was acted upon I do not know. It is, however, of but little consequence, in view of the universal custom, both before and after, to sign bills before the legislature adjourned.

This provision of the Constitution of the United States is in the exact language of that of 1835. Congress and the presidents have always, since the foundation of the

government, construed this provision to prohibit the signing of bills after Congress has adjourned. It is well known that Congress has been in the habit of turning the clocks in the capitol back in order to secure the signing of bills before the hour of final adjournment. This is based upon the well-known rule of evidence that the journals of legislatures and Congress cannot be impeached, nor can parol evidence be introduced to show a different state of affairs than that which appears upon the face of the record. The president, on the last day of the session, goes, and has always gone, to the executive room in the capitol, in order to sign all bills before the final adjournment. As in our State, so in the United States, there is just one instance of a bill having been signed after Congress adjourned. Why it was signed by President Lincoln after adjournment, or why it was not signed before, is unknown, so far as my research has extended. This bill conferred direct power upon the executive of the nation, but he did not dare to, and did not, act upon it. In a note to the lectures of Justice Miller upon the United States Constitution, at page 187, appears the following in regard to this act:

" *Power to approve an act after the adjournment of Congress:* On the 3d of March, 1863, Congress passed 'An act to provide for the collection of abandoned property, and for the prevention of frauds in insurrectionary districts within the United States.' On the 4th of March that Congress was adjourned *sine die,* under the Constitution, and that act had not received the signature of the president. On the 12th of the same March (within the 10 days), President Lincoln signed it, and it was printed with the other acts of that Congress. Under its operation, a large amount of property came into the possession of the executive; but it was not thought wise to attempt to administer upon it in the courts, without a recognition by the lawmaking power, which should practically amount to its re-enactment. Accordingly, Congress, on the 20th of July, 1864, passed 'An act in addition to the several acts concerning commercial intercourse between loyal and insurrectionary States, and to provide for the collection of captured and abandoned property, and the preven-

tion of frauds in States declared in insurrection.' This statute practically re-enacted the previous act, with amendments, and thus disposed of the difficulty."

I cannot concur with my brethren in saying that this is a recognition on the part of President Lincoln of the power here asserted. On the contrary, it is, in my judgment, additional proof that he did not consider the law valid. Had he so believed, he would undoubtedly have acted upon it.

It would not be complimentary to the intelligence of the members of the convention of 1850, many of whom were leading men of the State, and lawyers, and some of whom had been members of Congress, to say that they were not familiar with this practical construction placed upon this provision of the Constitution by the different legislatures and by the governors of this State, and also with the construction which up to that time had been, without any exception, placed by Congress and the presidents, most of whom had been distinguished lawyers, upon the identical article in the Constitution of the United States. Can there be, under this state of facts, any other logical conclusion than that the framers of the present Constitution understood and believed that no such power existed in the executive; that they recognized the injustice and inconvenience of compelling the executive to sign all bills passed on the closing days of the session, as had been universally done before; and that their sole purpose was to create an authority which did not exist before? Is it not also absurd to say that that convention intended to give a shorter time to examine bills passed during the last five days of the session than those passed within a few days previous?

If I am correct in this conclusion as to the Constitution of 1835, then the whole basis of the respondent's contention and the opinion of my brethren falls to the ground. The sole basis upon which the respondent seeks to establish the power is that it existed under the old Constitution. If this were so, he is then driven to the—in my judgment —absurd conclusion that the framers of the Constitution

intended to confer a less time upon the governor to consider bills passed during the last five days than he did upon those passed a few days previous. Under this contention, it results that the governor may have 10 days in which to consider bills passed upon the sixth day before the close of the session, while he would have but five in which to consider those passed upon the last day. I cannot yield my assent to such a conclusion. I see no reason or common sense in it. The learned counsel for the respondent entirely overlook the cardinal rule of construction above referred to, viz. : "*Inclusio unius est exclusio alterius.*" The inclusion of the right to sign bills for a certain time after the legislature has adjourned necessarily excludes the right to sign any other bills at any other time. Says Mr. Justice COOLEY of this canon of construction :

"So the forms prescribed for legislative action are in the nature of limitations upon its authority. The constitutional provisions which establish them are equivalent to a declaration that the legislative power shall be exercised under these forms, and *shall not be exercised under any other.* A statute which does not observe them will plainly be ineffectual." Cooley, Const. Lim. (6th Ed.) p. 209.

Four methods are expressly provided for in this Constitution by which bills passed by the legislature shall become laws, viz. : (1) By the express approval of the governor, evidenced by his signing bills within 10 days after they are presented to him, the legislature being in session; (2) by his approval implied from his neglect to sign within 10 days, the legislature being in session; (3) by passing the bill over his veto; and (4) by his express approval, evidenced by his signing any bill passed during the last five days of the session within five days after adjournment. Where an express limited power is conferred by a Constitution, it excludes the existence of any greater or unlimited power. For 23 years after the adoption of the present Constitution, no governor signed any bill or joint resolution after the legislature had adjourned except those

which were passed during the last five days. During that period, all governors and legislatures were careful to see that all bills and joint resolutions which were passed before the last five days were disposed of, by approval or otherwise, before final adjournment. If we add to this the 15 years of the existence of the Constitution of 1835, we have 38 years of compliance with the plain provisions of the Constitution to the effect that the governor did not possess the power to sign bills after the legislature adjourned, except in accordance with the express provision of the Constitution of 1850. If this is not a practical construction of this provision, then I am unable to understand what the term means. To refrain for 38 years from exercising a power when the occasions for its exercise were ever present is certainly as effectual and practical a construction as would be the affirmative exercise of power of doubtful constitutional authority extending over the same period. If one is to prevail, so must the other.

It is insisted, however, that the governors have, during and since 1873, signed several bills, which were passed before the last five days of the session, after adjournment, and that this amounts to a practical construction. This might have some force if such usage had commenced immediately after the adoption of the Constitution, and continued for a long series of years. It is shorn of its force by the adoption of the contrary usage by the governors, the legislatures, and the people. Neither governors, nor any other officials, nor the legislature, can change the plain provisions of the Constitution, or change a practical construction when once it has been adopted by constant usage, extending over a long period. I quote with approval the words of Mr. Justice Cassoday in *State* v. *Cunningham*, 83 Wis. 48:

"It is to be remembered that even praiseworthy objects cannot be rightfully attained by a violation of law. Every effort to fritter away the plain language of the Constitution, by way of construction or otherwise, even to secure a desirable end, is nothing less than an insidious

attempt to undermine the fundamental law of the State, and hence, to that extent, destructive of good government, besides being vicious in its tendencies."

See, also, *Oakley* v. *Aspinwall*, 3 N. Y. 568; Cooley, Const. Lim. (6th Ed.) p. 87.

Practical construction is not a shuttlecock, to be used to mean one thing today and another tomorrow, as expediency may suggest.   Where doubt exists, and where practical construction has once been firmly established by usage, it is as binding, lasting, and sacred as though it were incorporated in the Constitution in express terms.   It hardly needs the citation of authorities to show that this construction, contemporaneous with, and immediately, and for a long series of years, following, the adoption of this Constitution, must control.   I will, however, refer to one authority, where the question is fully discussed and the authorities cited,—*McPherson* v. *Secretary of State*, 92 Mich. 377; same case in 146 U. S. 3.   There, as here, it was sought to set aside a construction which had been placed upon a provision of the Federal Constitution immediately succeeding its adoption by the various States of the Union. It was contended that all the States had for many years prior to 1892 adopted a contrary interpretation by legislative enactments, to the effect that the State shall act as a unit in the choice of presidential electors.   We held that there was no force in such contention, and that the construction which the people had first given it must prevail. The decision was affirmed by the Supreme Court of the United States, and for the same reasons given in this court.

In 1873 the governor signed one bill passed before the last five days.   So, in 1877, the then governor signed another.   We find no explanation why those two bills were thus overlooked.   Probably, it occurred from the hurry of the closing days of the session.   We are cited to several other similar acts in 1889, and again a few in 1893. So far as most of the acts of 1889 are concerned, it is far more reasonable to suppose that the governor signed them

for two other reasons rather than that because he interpreted the Constitution to confer a power outside its plain provisions. Most of these bills were presented to him during the last five days of the session. Under a provision of the Constitution of Minnesota, identical with our own except as to the number of days, and a further provision requiring bills to be enrolled and signed by the presiding officers of each house, it was held that the enrollment and presentation to the governor were legislative acts, and that a bill was not passed, within the meaning of the Constitution, until the enrollment had taken place. *Burns* v. *Sewell*, 48 Minn. 425. Most of these bills, also, were actually passed within the last five days of the session, if Sunday be excluded. There is certainly much force in saying that the last five days of the session mean the days of actual session, and do not include Sunday, which is not a legislative day. What views the governors who signed these bills may have entertained upon these points we have no means of knowing. From 1835 to 1873 the occasion for the exercise of this power was more imperative than it has been since, for during most of the earlier sessions the legislature passed bills on the very last day; while since 1873, and perhaps for a short time before, it has been the universal custom to do no business during the last three or four days of the session, except the signing of enrolled bills by the president of the senate and the speaker of the house, for the approval of the governor, and the entry of the same upon the journal.

None of the authorities cited in the majority opinion are under a Constitution at all similar to our own. The only decision under a similar Constitution is in direct conflict with that opinion, as I read it. The provision in the Minnesota Constitution reads as follows: " The governor may approve, sign, and file in the office of the secretary of state, within three days after the adjournment of the legislature, any act passed during the last three days of the session, and the same shall become a law." *Burns* v.

*Sewell, supra.* It is true that this case holds that without this clause the governor had power to approve bills after adjournment, but it also holds that this clause is "a limitation upon his power, restricting its exercise to the period of three days after the legislature shall adjourn."

The respondent here contends—and upon that theory alone can his contention be sustained—that the five-day limit has no effect upon or application to bills passed before the last five days of the session. To what extent will the advocates of this rule of construction carry it? Suppose a governor shall in the future, for some reason, sign a bill 15 or 20 days after the legislature adjourns, and other governors subsequently follow his example; will that be another practical construction, and affirm the right of the governors to sign bills at any time they choose? Such was the contention in *People* v. *Bowen*, 21 N. Y. 517, the principal case upon which respondent relies. Upon this point the majority opinion says:

"It is argued that, upon the construction which I have suggested, no time whatever is fixed within which bills are, in such cases, to be signed; and that, if it can be done after the adjournment, it may be done at any indefinite period thereafter, and that the inconvenience would arise that it might remain a long time uncertain whether a measure which has received the assent of both branches of the legislature should eventually be a law or not. This consequence will certainly follow unless there is an implication arising out of the fixing of a period of 10 days for the consideration of bills presented to the governor while the legislature remain in actual session. It is plain that the authors of the Constitution considered that period sufficiently long for the performance of that duty; and I think he would not be justified in acting upon a bill after his ten days had elapsed, whether the session continued or not."

That decision is, in my opinion, an act of judicial ingraftment, based upon a supposed necessity, and not a precedent of construction which ought to be followed.

I deem it unnecessary to discuss the other authorities cited. The case of *People* v. *Bowen* was by a divided

court. So, also, was the case of *Lankford* v. *County Commissioners*, 73 Md. 105. In *Solomon* v. *Commissioners of Cartersville*, 41 Ga. 161, the decision was expressly based upon the practice of the executive department, while it, in effect, held that there was no doubt about the construction to be placed upon the Constitution, which was similar to that of New York. The other cases arise upon provisions so entirely dissimilar both from our own Constitution and from that of New York that they seem to me to have no bearing. The California case is, in my judgment, based upon sound reason, and gives to the clause of the Constitution involved in that and the New York case, and the Constitution of Michigan for 1835, its plain, logical, and common-sense meaning, viz., that the adjournment of the legislature prohibited every unsigned bill in the hands of the governor at the time of adjournment from becoming a law. The decisions to the contrary are based upon the argument of expediency and public inconvenience, and not upon sound canons of construction.

I think the writ should be granted.