WILLIAM MCPHERSON, JR., ET AL. V. ROBERT R. BLACKER, SECRETARY OF STATE.[1]

*Constitutional law—Election of presidential electors—Title of act —Miner law.*

1. In affirming the constitutionality of Act No. 50, Laws of 1891, entitled "An act to provide for the election of electors of President and Vice President of the United States," and which divides the State into the eastern and western electoral districts, composed of designated congressional districts, and provides for the election of an elector and alternate elector of President and Vice President in each of said electoral and congressional districts, the Court hold:

*a*—The act is not in conflict with clause 2 of section 1 of article 2 of the Federal Constitution, which provides that "each state shall appoint, in such manner as the legislature thereof may direct, a number of electors equal to the whole number of Senators and Representatives to which the state may be entitled in the Congress."

*b*—It is not in conflict with the fourteenth and fifteenth amendments to the Federal Constitution.

*c*—It does not violate section 20 of article 4 of the Constitution of Michigan, which provides that no law shall embrace more than one object, which shall be expressed in its title, in that it provides for the election of alternate electors, whereas the title relates only to choosing electors.

*d*—It is not invalid because it fails to make provision for filling the vacancy which might arise by reason of the death or disability of the elector and alternate elector.

[1]The judgment in this case was affirmed by the Supreme Court of the United States, October 17, 1892. See 13 Sup. Ct. Rep. 3.

*e*—It is not inoperative because it does not provide for notice of the election of the electors, such notice being required to be given by the Secretary of State under How. Stat. § 147, which remains in force.

*f*—It is not defective and inoperative because no provision is made for a separate canvass of the votes cast in each electoral district of Wayne county by the board of county canvassers.

*g*—It is not *wholly* inoperative because, in attempting to fix a date for the meeting of the electors and the method of certifying their action, it is in conflict with the law of Congress on those subjects.

2. The following propositions are summarized from the opinion of Mr Justice MONTGOMERY:

*a*—The word "state," as used in clause 2 of section 1 of article 2 of the Federal Constitution, which provides that "each state shall appoint, in such manner as the legislature thereof may direct," electors, etc., means the body politic and corporate.

*b*—If the question of the proper construction of said constitutional provision were to be determined solely by reference to the language employed, there would be much force in the contention that the state must act as a unit, and that no lesser body can be delegated to perform any portion of the duty vested in the state as a body corporate, and it might possibly be held that the words, "in such manner as the legislature thereof may direct," confer only the limited power of directing how the state, acting as an entirety, shall make its appointment. But as these words are clearly susceptible of a construction which confers upon the legislature the power to say how the state action shall be voiced, resort is properly had to contemporaneous construction; citing Cooley, Const. Lim. 67; *Martin v. Hunter's Lessee,* 1 Wheat. 351; *Bank v. Halstead,* 10 Id. 63; *Ogden v. Saunders,* 12 Id. 290; *People v. Dean,* 14 Mich. 406; *Bay City v. State Treasurer,* 23 Id. 499; *People v. Harding,* 53 Id. 481; *Detroit City Ry. v. Mills,* 85 Id. 646.

*c*—The practical construction placed upon this section was certainly such as to maintain the contention of the respondent, that the contemporaneous interpretation was that plenary power was reposed in the legislatures of the several states to prescribe methods for choosing electors other than by a vote of the electors of the entire state, or by any agency which, in the performance of other public functions, represented the entire state.

*d*—The exercise of the right to choose electors by districts

began at the first election held under the Constitution, and continued to be exercised by some of the states for a period of 40 years; nor was this method abandoned, except possibly in a single instance, because of growing doubts as to its constitutionality, but the states in which it had been invoked adopted a general ticket method, it is believed, in order that more power could be wielded by the state in political conventions; citing 3 Mad. Writings, 333.

e—It is urged that the fact that the district system has been abandoned is evidence from which it may be inferred that there has been a growing belief in the unconstitutionality of that method; and that "any examination of the history of the methods of choosing presidential electors which approximates philosophic or scientific inquiry can only result in the conclusion that the states, in coming to the use of the general ticket, by a common consent and practice gave to the Constitution a construction and a meaning which it might not otherwise now have, but which is nevertheless of the most conclusive and binding character." There would doubtless be great force in the practical construction which has obtained for 60 years, even though not contemporaneous, if it involved of necessity a negation of the right claimed by the Legislature in this case; but the fact that the several states have provided by their legislatures for choosing electors on a general ticket does not involve an assertion that the power to choose by districts does not exist.

f—In so far as the argument of counsel assumes that our Constitution is subject to growth, it is, in our judgment, inconsistent with the purpose and duty sacredly to maintain the integrity of that instrument, to treat it as subject to modification except by the prescribed methods. And especially is it inconsistent with established rules to say that by non-user a commonwealth may lose the power to exercise rights expressly delegated in a written constitution. If, under the Constitution, and after 40 years of practical construction, the state had the right to choose electors by districts, it does not lie with any court to assert that that right has been lost by non-user.

g—Neither by the fourteenth nor fifteenth amendment to the Federal Constitution was there any attempt to place limitations upon the authority of the state as to the choice of officers theretofore existing.

h—Presidential electors are still regarded as state officers (In re Green, 134 U. S. 377); and to hold that because, at the time of the adoption of the fourteenth amendment, the general custom was to elect electors by the states at large, this secured irrevocably the right of every male citizen 21 years of age to

vote directly for the number of electors to which the state is entitled, would be to hold also that the method of choosing state officers, including judicial officers, which at the time of the adoption of this amendment obtained, was irrevocably fixed beyond the power of the legislatures of the several states to change; which amendment is not susceptible of this construction.

*i*—The act is in conflict with the law of Congress in so far as it attempts to fix a date for the meeting of electors and the method of certifying their action, and to this extent must give way to the congressional enactment; but the *entire* act is not for this reason inoperative, the rule being that the unconstitutionality of one portion of a statute cannot defeat other portions, unless the nature of the unconstitutional provision is such as to render it of vital importance to the law; citing *People v. Mahaney*, 13 Mich. 481; *People v. Richmond*, 59 Id. 570; *Attorney General v. Amos*, 60 Id. 372; *Robison v. Miner*, 68 Id. 549.

*Mandamus.*    Argued May 19, 1892.    Denied June 17, 1892.

Relators applied for *mandamus* to compel respondent to give notice of the election of electors of President and Vice President in the manner provided by How. Stat. § 240.    The facts are stated in the opinion.

*Henry M. Duffield* (*F. A. Baker, B. M. Cutcheon,* and *Henry A. Haigh,* of counsel), for relators.

*A. A. Ellis,* Attorney General (*J. W. Champlin, Otto Kirchner,* and *T. E. Barkworth,* of counsel), for respondent.

MONTGOMERY, J.    The relators, who are candidates for the office of electors of President and Vice President, placed in nomination by the Republican party, ask for a *mandamus* to compel the respondent to give notice of an election to be held on the first Tuesday after the first Monday in November, to fill said offices, under the statute in former years providing for an election of electors by the State at large.    The relators allege that Act No. 50

of the Public Acts of 1891, known as the "Miner Law," is unconstitutional and void.

It is *first* averred that the law in question is in conflict with article 2, § 1, clause 2, of the Federal Constitution, in this: That it attempts to delegate to portions of the State, fixed as districts by the Legislature, the power to name electors, whereas the section referred to, it is contended, confers this authority and duty upon the State at large, acting as a corporate unit in its corporate capacity.

*Secondly*, it is contended that, even though the Legislature may thus delegate the authority to districts, the law enacted is fatally defective in the following respects: (*a*) That it violates article 4, § 20, of the Constitution of this State, which provides that no law shall embrace more than one object, which shall be expressed in its title, in that it provides for an election of alternate electors, whereas the title relates only to choosing electors; (*b*) that it fails to provide means for canvassing the votes for electors in those portions of Wayne county which constitute the first and portions of the second, sixth, and seventh electoral districts; (*c*) that, even if the election of alternate electors is valid, the act makes no provision for filling the office in case both the elector and the alternate shall die or become disqualified before performing their duties.

Most evidently the question of greatest importance is that relating to the true interpretation of section 1, clause 2, art. 2, of the Federal Constitution. The provision of that section is that—

"Each state shall appoint, in such manner as the legislature thereof may direct, a number of electors equal to the whole number of Senators and Representatives to which the state may be entitled in the Congress."

On both sides it appears to be conceded that the word

"state," as here employed, means the body politic and corporate. On the part of the relators it is contended that the state must, in the choice of electors, act as a unit, and cannot delegate the authority to name electors to any fractional part of the state, as a district fixed for that purpose alone, or for that and other political action. On the part of the respondent it is contended that the section in question gives the legislature plenary power to prescribe how and in what manner the state may choose its electors, whether by the legislature itself, or by all the electors voting for a general ticket, or by electors voting in districts.

In Story on the Constitution (volume 2, § 1472) it is said:

"It is observable that the language of the Constitution is that 'each state shall appoint, in such manner as the legislature thereof may direct,' the number of electors to which the state is entitled. Under this authority the appointment of electors has been variously provided for by the state legislatures. In some states the legislature have directly chosen the electors by themselves; in others they have been chosen by the people by a general ticket throughout the whole state; and in others by the people in electoral districts, fixed by the legislature, a certain number of electors being apportioned to each district. No question has ever arisen as to the constitutionality of either mode, except that of a direct choice by the legislature. But this, though often doubted by able and ingenious minds, has been firmly established in practice ever since the adoption of the Constitution, and does not now seem to admit of controversy, even if a suitable tribunal existed to adjudicate upon it."

If the question were to be determined solely by reference to the language employed, it may be admitted that there would be much force in the contention that the state must act as a unit, and that no lesser body can be delegated to perform any portion of the duty vested in the state as a body corporate, and it might possibly be

held that the words, " in such manner as the legislature thereof may direct," confer only the limited power of directing how the state, acting as an entirety, shall make its appointment. But, in our judgment, these words are clearly *susceptible* of a construction which confers upon the legislature the power to say how the state action shall be voiced. In such a case resort is properly had to contemporaneous construction. Judge Cooley, in his work on the Constitution, says:

" Contemporaneous interpretation may indicate merely the understanding with which the people received it at the time, or it may be accompanied by acts done in putting the instrument in operation, and which necessarily assume that it is to be construed in a particular way. In the first case it can have very little force, because the evidences of the public understanding, when nothing has been done under the provision in question, must always of necessity be vague and indecisive. But where there has been a practical construction, which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the courts with a plausibility and force which it is not easy to resist. Indeed, where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention." Cooley, Const. Lim. p. 67 (6th ed. p. 81).

This rule has been so frequently recognized both by this Court and the Supreme Court of the United States as to require little more than a reference to the authorities. *Martin v. Hunter's Lessee,* 1 Wheat. 351; *Bank v. Halstead,* 10 Id. 63; *Ogden v. Saunders,* 12 Id. 290; *People v. Dean,* 14 Mich. 406; *Bay City v. State Treasurer,* 23 Id. 499; *Detroit City Ry. v. Mills,* 85 Id. 646.

Speaking of this rule, in *Ogden v. Saunders,* Mr. Justice JOHNSON says:

"It proceeds upon the presumption that the contemporaries of the Constitution have claims to our deference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the Constitution, and of the sense put upon it by the people when it was adopted by them."

In *Bay City v. State Treasurer, supra,* it was held that constitutions are to be construed as the people construed them in their adoption, if possible, and the public history of the times should be consulted, and should have weight in arriving at that construction. See, also, *People v. Harding,* 53 Mich. 481.

The practical construction which was placed upon the section under consideration was certainly such as to maintain the contention of the respondent that the contemporaneous interpretation was that by this section plenary power was reposed in the legislatures of the several states to prescribe methods for choosing electors other than by a vote of the electors of the entire state, or by any agency which, in the performance of other public functions, represented the entire state. In the first presidential election Maryland and Virginia each adopted the district plan. Maryland continued so to choose her electors down to and including the year 1832. Massachusetts, in 1788, adopted a plan of nominating electors in districts by a vote of the people, to whom the legislature was limited in making a choice. In 1796 they were chosen by districts. In New York the method of choosing electors first adopted was by vote of the legislature, but in 1825 the district system was adopted, and was in use in the election of 1828. In North Carolina the district system was adopted in 1803, and in

use in 1804 and 1808. In Kentucky the district system prevailed until 1828. In Tennessee the district system prevailed from 1796 to 1836. In Indiana the district system was used in 1824 and 1828. In Illinois the district system prevailed from its admission into the Union until 1827. In Maine, also,. the district system prevailed from 1820 until and including the election of 1828. It will be seen, therefore, that the exercise of the right to choose electors by districts began at the first election held under the Constitution, and continued to be exercised by some of the states for a period of 40 years. Nor was an abandonment of this method due, except possibly in a single instance, to growing doubts as to its constitutionality. The states in which it had been · invoked adopted a general ticket method, it is believed, not because of any doubt of the authority to choose electors in districts, but in order that more power could be wielded by the state in political conventions. Madison, who acted as a member of the committee which reported to the federal convention the method finally adopted for electing President, in a letter written in 1823, and in which a constitutional amendment which should make the choice of electors by districts imperative was recommended by him, in referring to the action of the convention, said:

"The district mode was mostly, if not exclusively, in view when the Constitution was framed and adopted, and was exchanged for the general.ticket and the legislative election as the only expedient for baffling the policy of the particular states which had set the example." 3 Mad. Writings, 333.

Another persuasive fact in determining whether the intention was to limit the exercise of the right of the state to choose electors to a method which involved action

92 MICH.—25.

by the state as a unit is the practical construction
placed upon section 2, of article 1, which provides that
"the House of Representatives shall be composed of
members chosen every second year by the people
of the several states," and that until enumeration shall
be made "the state of New Hampshire shall be entitled
to choose three, Massachusetts eight," etc. There is
certainly the same ground for contention that the
authority given to a state to choose three or eight
representatives involves action by the state as a unit as
there is to say that the provision that each state shall
appoint electors in such manner as the legislature thereof
may direct requires action by the state as a unit, and
yet, from the time of the adoption of the Constitution,
the power of the state to provide for choosing Representa-
tives by districts has not been questioned, nor has the power
to choose by an election at large been questioned (where no
law of Congress intervenes); so that there has been a
practical construction, which has continued down to this
day, which establishes that, under the provisions of
section 2, art. 1, the state, having authority to choose
representatives, has the choice of methods, and may elect
by districts or *en masse.*

But it is urged that the fact that the district system has
been abandoned is evidence from which it may be inferred
that there has been a growing belief in the unconstitu-
tionality of that method; and it is further stated in the
briefs of the counsel that—

"Any examination of the history of the methods of
choosing presidential electors which approximates phil-
osophic or scientific inquiry can only result in the con-
clusion that the states, in coming to the use of the gen-
eral ticket, by a common consent and practice gave to
the Constitution a construction and a meaning which it

might not otherwise now have, but which is nevertheless of the most conclusive and binding character."

There would doubtless be great force in the practical construction which has obtained for 60 years, even though not contemporaneous, if such construction involved of necessity a negation of the right claimed by the Legislature in this case; but the fact that the several states have provided by their legislatures for choosing electors on a general ticket does not involve an assertion that the power to choose by districts does not exist. And, in so far as the argument of counsel assumes that our Constitution is subject to growth, it is, in our judgment, inconsistent with the purpose and duty sacredly to maintain the integrity of that instrument, to treat it as subject to modification except by the prescribed agencies and by the prescribed methods. And especially is it inconsistent with established rules to say that by non-user a commonwealth may lose the power to exercise rights expressly delegated in a written constitution. If, under the Constitution, and after 40 years of practical construction, the state had the right to choose electors by districts, it does not lie with any court to assert that that right has been lost to the state by non-user.

In *Bay City v. State Treasurer*, 23 Mich. 499, Mr. Justice COOLEY, speaking for the Court, said:

"Constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that, in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They

must construe them as the people did in their adoption, if the means of arriving at that construction are within their power."

It has evidently not been the view of eminent statesmen either that the original construction of this section should have been such as to exclude the power of the legislature to adopt the district method, or that that power has been lost by non-user, for as late as 1874 the committee on privileges and elections of the United States Senate made a report, in which, speaking of this section, it was said:

"The appointment of these electors is thus placed absolutely and wholly with the legislatures of the several states. They may be chosen by the legislature, or the legislature may provide that they shall be elected by the people of the state at large, or in districts, as are members of Congress, which was the case formerly in many states."

But it is urged that the act in question is in conflict with the fourteenth and fifteenth amendments; and it is said that at the time these amendments were adopted the method of choosing electors actually in vogue in all the states was by vote of the people at large for a general ticket, and, as it is provided by the fourteenth amendment that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," and also provided that "when the right to vote at any election for the choice of electors for President and Vice President    *    *    *    is denied to any of the male inhabitants of such state, being twenty-one years of age and citizens of the United States, or in any way abridged, except for participation in rebellion or other crime, the basis of representation therein shall be reduced," and as the fifteenth amendment provided that "the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color,

or previous condition of servitude," that these amendments are to be held to have relation to the conditions then existing, and that, in effect, they operate to repeal by implication so much of article 2, § 1, as to prescribe the manner of choosing electors.

It would, in our opinion, be a strained construction which should give to either of these amendments the effect to annul the power expressly delegated in section 1, art. 2. But here again we are not without the aid of contemporaneous construction. As already pointed out, the committee on privileges and elections of the Senate, composed, as it was, of men who participated in the adoption of these amendments, reported in 1874, in the most unequivocal terms, that this power still rested with the legislature. The question was also discussed by eminent members of the electoral commission of 1877. Commissioner Frelinghuysen, speaking of the power of the state to appoint electors, said:

"Under this power, the legislature might direct that the electors should be appointed by the legislature, by the executive, by the judiciary, or by the people. In the earliest days of the republic electors were appointed by the legislatures. In Pennsylvania they were appointed by the judiciary. Now, in all the states except Colorado, they are appointed by the people."

Commissioner Hoar said:

"Upon the whole matter, therefore, I am of opinion that the appointment of electors and the ascertaining who has been appointed is the sole and exclusive prerogative of the state. The state acts by such agencies as it selects."

Mr. Justice FIELD said:

"The Constitution declares that each state shall appoint electors 'in such manner as the legislature thereof may direct.' * * * With the exception of these provisions as to the number of electors and the ineligibility of certain persons, the power of choice on the part of the state

is unrestricted. The manner of appointment is left entirely to its legislature."

Mr. Justice MILLER, commissioner, said:

"If elected by the legislature, as they may be, an appropriate mode [of certifying the election] would be the signatures of the presiding officers of the two houses to the fact of such appointment, or a certified copy of the act by which they were elected."

*In re Kemmler*, 136 U. S. 448 (10 Sup. Ct. Rep. 934), it was said:

"The fourteenth amendment did not radically change the whole theory of the relations of the state and federal government to each other, and of both governments to the people."

See, also, *Minor v. Happersett*, 21 Wall. 162.

It is very clear that the fifteenth amendment was intended to preclude the state from making any discrimination against citizens on account of color. No reasoning could make this plainer than does the mere reading of the provision:

"The right of citizens of the United States to vote shall not be denied or abridged * * * on account of race, color, or previous condition of servitude."

There is no attempt to place limitations upon the power of the state, except that in any case where the right of suffrage is involved the class protected by this amendment shall not be discriminated against. Neither by the fourteenth nor fifteenth amendment was there any attempt to place limitations upon the authority of the state as to the choice of officers theretofore existing. Presidential electors are still regarded as state officers. *In re Green*, 134 U. S. 377 (10 Sup. Ct. Rep. 586). And to hold that because, at the time of the adoption of the fourteenth amendment, the general custom was to elect by the states at large, this secured irrevocably the

right of each male citizen 21 years of age to vote directly for the number of electors to which the state is entitled, would be to hold also that the method of choosing state officers, including judicial officers, which at the time of the adoption of this amendment obtained, was irrevocably fixed beyond the power of the legislatures of the several states to change. We do not think the amendment is susceptible of this construction.

Does this act embrace more than one object, and, if not, is that object sufficiently expressed in its title? It is held that the provision of the Constitution requiring that the object shall be expressed, etc., is fully accomplished when the statute has but one general object, and when such object is fairly indicated by its title. Every end and means necessary to the accomplishment of the general object need not be provided for by a separate act relating to that alone. *People v. Mahaney,* 13 Mich. 481; *Kurtz v. People,* 33 Id. 279; *Ryerson v. Utley,* 16 Id. 270. The title of this act is—

"An act to provide for the election of electors of President and Vice President of the United States, and to repeal all other acts and parts of acts in conflict. herewith."

It is said that the body of the act provides for the election of alternate electors as well as electors, and that alternate electors are not named in the title. It would hardly be contended that it was not competent under this title to provide for filling vacancies occasioned by the death or disability of one of the electors first chosen. This act, in effect, does no more than that. Technically, also, alternate electors are, before they become officials vested with any functions whatever, electors. The sole object of their election is that they shall, in a certain event, exercise the function of electors. The question might be quite different if they were elected.

to a distinct office, having duties to perform, and with a provision that they should have added to those duties the function of . electors in the event of the disability of their principals.

It is also urged as an objection to the validity to this law that, in case of the death or disability of both the elector and alternate, no provision is made for filling the vacancy, and it is therefore claimed to be inoperative. But it is only necessary to say that, if this be true, then any attempt to appoint electors would fail; for, under the former statute existing in this State, and under all statutes vesting power to fill vacancies in the electoral college, death might intervene, and prevent the exercise of that function.

Can the act be said to be inoperative and void because so defective that its provisions cannot be given effect? It is first claimed that the law is defective in not requiring notice of the election of the district electors provided for; but we think this criticism without force.   Section 147 of Howell's Statutes remains in force, and by the express terms of that statute the Secretary of State is required to give notice that there are to be chosen "as many of the following officers as are to be elected at such general election, viz.: A governor, * * * electors of President and Vice President." The electors provided for in this act are to be chosen at this general election, and it is the plain duty of the Secretary of State to give notice of that fact.

It is next urged that the law is defective and inoperative, for the reason that no means are provided either by the act itself or the general law for canvassing votes in Wayne county.  The general law (Act No. 190, Laws of 1891) provides, by section 1, for inspectors of election for elections at which presidential electors may be voted for.   Section 36 provides for a canvass of the votes.

Section 38 requires duplicate statements of the result to be prepared, one copy of which is to be filed, and the other delivered to the inspector appointed by the board to attend the county canvass. Section 184 of Howell's Statutes provides that the board of canvassers shall proceed to canvass the votes, and section 185 requires a statement of votes given for electors of President and Vice President of the United States each year in which such electors are to be chosen. The act in question, in section 2, provides that—

"The counting, canvassing, and certifying of the votes cast for said electors at large and their alternates, and said district electors and their alternates, shall be. done, as near as may be, in the same manner as is now provided by law for the election of electors of President and Vice President of the United States."

The precise point appears to be that, as the votes cast in the county for the presidential electors are cast in different electoral districts, there is no provision for a separate canvass of the votes cast in each district by the board of canvassers. We do not see the least difficulty in applying the law. It would, of course, be the duty of the inspectors to designate the district in which the elector is voted for; and, as the district is defined by law, there is no more difficulty in canvassing such votes than there is in the Board of State Canvassers crediting to the one entitled the votes cast in the proper judicial circuit for circuit judge.

The act in question is in conflict with the law of Congress in so far as it attempts to fix a date for the meeting of electors and the method of certifying their action. Does this render the entire act inoperative? There is no doubt of the rule that where a law of a state conflicts with a law of Congress in a matter in reference to which Congress has the right to legislate the state law must give way to the extent of such con-

flict. *Robinson v. Rice*, 3 Mich. 242. The law is not necessarily inoperative *in toto* because in some of its provisions the Legislature has exceeded its power. On the contrary, the rule is stated to be that the unconstitutionality of one portion of a statute cannot defeat other portions, unless the nature of the unconstitutional provision is such as to render it of vital importance to the law. *People v. Mahaney*, 13 Mich. 481. See, also, *People v. Richmond*, 59 Id. 570; *Attorney General v. Amos*, 60 Id. 372; *Robison v. Miner*, 68 Id. 549. This general rule is conceded, but it is contended that this statute furnishes evidence upon its face that it contains provisions which would not have been adopted had it been within the understanding of the Legislature that the provision relative to the date for the meeting of electors was inoperative. The statute providing, as it does, that "in case two or more persons have an equal and the highest number of votes for any office created by this act as canvassed by the Board of State Canvassers, the Legislature in joint convention shall choose one of said persons to fill such office, and it shall be the duty of the Governor to convene the Legislature in special session for such purpose immediately upon such determination by said Board of State Canvassers," it is urged that if it had been understood that the Legislature which is to be chosen at the same general election at which the presidential electors are chosen was to convene before the date when, under the law of Congress, the electors are permitted to cast their votes, it is not to be presumed that the Legislature would have provided for convening the Legislature in special session at large expense. But we are not able to say, as a matter of law, that this is true. The new Legislature will sit but three legislative days prior to the date fixed by the law of Congress for the meeting of electors. Nor is it clear

beyond question that it was not the purpose and intent of the present Legislature to retain the power of choosing the electors in case of tie rather than to commit it to their successors. We think there are evidences afforded by the act itself that such was their purpose. We cannot, therefore, say that this statute would not have been passed in the form in which it is without the provision relating to the time of the meeting of the electors, and therefore are not justified in holding that the law is wholly inoperative because of the conflict of that provision with the law of Congress upon the same subject.

We have considered the questions presented with the care which the exceeding importance of the issue seemed to us imperatively to require, and our conclusion is that the statute must stand as the lawful edict of the Legislature. Nearly 70 years ago Chancellor Kent wrote in regard to the election of the President as follows:

"The mode of his appointment presented one of the most difficult and momentous questions that occupied the deliberations of the assembly which framed the Constitution; and if ever the tranquility of this nation is to be disturbed, and its liberties endangered by a struggle for power, it will be upon this very subject of the choice of a President. This is the question that is eventually to test the goodness and try the strength of the Constitution; and if we shall be able, for half a century hereafter, to continue to elect the Chief Magistrate of the Union with discretion, moderation, and integrity, we shall undoubtedly stamp the highest value on our national character, and recommend our republican institutions, if not to the imitation, yet certainly to the esteem and admiration, of the more enlightened part of mankind." 1 Kent, Comm. 273.

The danger in this plenary power conferred by the Constitution upon the legislatures of the several states has been recognized by the wise and patriotic statesmen of all political parties, and several attempts have been made in Congress to secure an amendment requiring a

uniform mode. The language of Chancellor Kent was written shortly after a long debate in the United States Senate over proposed amendments. Ann. Cong. 1823–24, 167, 354, 375. To the intelligence, wisdom, and patriotism of our people is due the gratifying fact that the danger has thus far been averted, but the action resulting in the passage of the act in question is a reminder of the danger which may at any time be precipitated upon the country for the purpose of obtaining political power. The injustice of any other than a uniform system of electing the President of the United States is manifest. As has been recently well said:

"It is of the first and last consequence and importance that, in legislating upon this subject, it should not be regarded from a party standpoint."

But neither the fact that this most important consideration may have been overlooked, nor that this legislation may result in serious injustice, can extend our jurisdiction, or justify us in usurping functions which under the Constitution pertain to the Legislature. As was said by Mr. Justice Cassoday in the recent case of *State v. Cunningham* (Wis.), 51 N. W. Rep. 1135:

"It is to be remembered that even praiseworthy objects cannot be rightfully attained by a violation of law. Every effort to fritter away the plain language of the constitution, by way of construction or otherwise, even to secure a desirable end, is nothing less than an insidious attempt to undermine the fundamental law of the state, and hence, to that extent, destructive of good government, besides being vicious in its tendencies."

The writ should be denied.

The other Justices concurred.