ATTORNEY GENERAL, *ex rel.* BARBOUR, *v.* PINGREE.

1. MUNICIPAL CORPORATIONS — POWER TO OPERATE STREET RAIL-WAYS—CONSTITUTIONAL LIMITATIONS—INTERNAL IMPROVEMENTS.

Act No. 338, Local Acts 1899, purporting to empower a commission, to be appointed by the common council of the city of Detroit, to acquire for the city, and maintain and operate in its behalf, the system of street railways which lies partly within and partly without the corporate limits, and comprises over 140 miles of track, is void under article 14, § 9, of the Constitution, prohibiting the State from being a party to or interested in any work of internal improvement, the operations contemplated by the act being of sufficient magnitude to constitute internal improvements, and the legislature being powerless to authorize the municipality to do what the State could not itself do.

2. SAME — OWNERSHIP OF TRACKS ENTIRELY WITHIN CORPORATE LIMITS.

Whether municipal ownership of tracks entirely within the corporate limits might be authorized under the Constitution, —*quære.*

*Quo warranto* by Horace M. Oren, attorney general, on the relation of George H. Barbour and others, against Hazen S. Pingree, Elliott G. Stevenson, and Carl E. Schmidt, to determine the validity of the act creating the Detroit Street-Railway Commission. Submitted May 5, 1899. Judgment of ouster entered July 5, 1899.

*Elisha A. Fraser* and *Jasper C. Gates* ( *Charles A. Kent, Hinton E. Spalding, Otto Kirchner,* and *Elbridge F. Bacon,* of counsel), for relators.

*John J. Speed* ( *Henry M. Duffield, Fred A. Baker, John C. Donnelly,* and *Charles D. Joslyn,* of counsel), for respondents.

MOORE, J. This is a proceeding brought to test the validity of an act approved March 24, 1899, entitled "An act to authorize the city of Detroit to construct, acquire, maintain, and operate street railways, and to construct extensions thereof." Act No. 338, Local Acts 1899. The provisions of the act material to this discussion are as follows:

"*The people of the State of Michigan enact:*

"SECTION 1. That the common council of the city of Detroit be, and is hereby, authorized and empowered to appoint by resolution, at any time within the next 20 years, three persons, electors and freeholders of said city, who shall constitute a board of commissioners, to be known as the Detroit Street-Railway Commission. One of said commissioners shall be appointed for the term of two years, one for a term of four years, and one for a term of six years. Their successors shall be persons of like qualifications, and shall be appointed by the common council on the nomination of the mayor of said city, at the expiration of said term, for the term of six years. Vacancies shall be filled by appointment by the mayor, and persons so appointed shall hold office for the unexpired term. All members of said commission shall hold their offices, respectively, until their successors are appointed and qualified. Any person otherwise eligible may be appointed as aforesaid, notwithstanding he may hold other office, excepting that of alderman."

"SEC. 5. The said commission may in their discretion, and upon such terms and conditions as they may deem advisable for the interests of said city, acquire, by deed, lease, or other satisfactory conveyance from the company or companies owning the same to said city, any street railway or railways existing at the time of the passage of this act, and lying wholly within or partly within and

partly without said city, operated by the same company or companies, together with the property, assets, rights, privileges, etc., owned and used in connection with or pertaining to said railways, including rights to routes belonging to such company or companies upon which a railway shall not be in operation, and may operate and maintain said street railways so acquired, for the carriage of passengers and freight for hire.

"SEC. 6. Said commission may provide for the payment of rentals or other obligations, and may provide for a sinking fund for the discharge of any liens upon any of the property acquired by them, and may pledge the earnings and receipts of said railways for these purposes, and may use the earnings in operating and maintaining the same, and may use any surplus of earnings in acquiring any bonds secured by lien upon the property so acquired, or may use such surplus in making needed extensions or betterments to said railways. Said commission shall have no power to incur any obligation on behalf of said city, except such as shall be chargeable only upon the railways and property so acquired, and the earnings and increments and extensions thereof.

"SEC. 7. The said commission shall manage, maintain, and operate any street railway so acquired or extended, and may purchase from the revenues thereof all lands, tracks, cars, motors, dynamos, machinery, equipment, tools, and furniture necessary and useful therefor to be used in connection therewith, and may establish rates of fare for the carriage of passengers and freight, provided the rates of fare shall not exceed those now charged by the Detroit Citizens' Street-Railway Company. In operating any railway so acquired, the commission may exercise such other general powers as are possessed or exercised by boards of directors of corporations organized under the laws of this State providing for incorporation of street-railway companies.

"SEC. 8. After acquiring any railway or railways pursuant to section five hereof, said commission shall have the power to enter into agreements with any street-railway company, having a line of street railway, for or in relation to the exchange of tickets and transfers, and for the carriage of passengers, use of tracks, or operation of cars: *Provided*, that such agreements shall not be inconsistent with or in violation of the terms of the conveyance or contract mentioned in section five hereof."

" SEC. 11. All causes of action relating to or arising out of the owning, operating, or control of any street railway constructed or acquired by said commission shall be prosecuted by or against said commission by the name herein designated, and said commission shall carry into effect, pay, or discharge any order, decree, or judgment, in any suit or proceeding to which it shall be a party, in like manner as if the same were prosecuted or defended by said city: *Provided*, that no action for negligent injury arising out of the operation of said railways shall be maintained unless it be commenced within one year from the time when the injury was received, nor unless notice shall be given in writing, within thirty days from the time of such injury, to the said commission, its secretary or attorney, of the time, place, and circumstances of such injury, and of the nature thereof.

"SEC. 12. Nothing in this act shall be construed as granting any franchise to any of the existing street-railway companies, or as extending the life of any existing franchise, or as implying any franchise rights in case of reversion of the property to the grantors or their successors; and said commission is hereby expressly prohibited from granting or extending the life of any franchise under any of the powers conferred upon it by this act."

After the passage of the act, the common council, at an adjourned special meeting, appointed the respondents as members of the commission, and they at once entered into negotiations for the purchase of the various street railways in Detroit.

The case is one of vast importance, not only because of the magnitude of the interests involved, but also because the law proposes an entirely new departure in this country, in relation to the ownership and management of one of the most important interests in the business world. We are not favored with precedents which will aid us, because, with all of their zeal and ability, counsel have not been able to find where an undertaking just like this has been entered upon. We have, however, had the benefit, not only of well-prepared written briefs, but of such oral arguments as the learned counsel, who have given the questions involved special thought and investigation, cared to

make.   We have endeavored to give the case such attention as its importance deserves.

It is claimed on the part of the attorney general that the act is unconstitutional and void for the following, among other, reasons:

"1. Because said act undertakes to confer upon the city of Detroit authority to engage in a work of internal improvement, contrary to the provisions of section 9 of article 14 of said Constitution.

"2. Because said act undertakes to confer upon a municipal corporation powers which are neither local, legislative, nor administrative, contrary to the provisions of section 38 of article 4 of said Constitution.

"3. Because said act purports to give to said Detroit Street-Railway Commission, mentioned in said act, unlimited and unrestricted power to contract debts for, and loan the credit of, said city of Detroit, contrary to the tenor and effect of section 13 of article 15 of said Constitution, which provides that the legislature shall provide for the incorporation and organization of cities and villages, and shall restrict their powers of taxation, borrowing money, contracting debts, and loaning their credit.

"4. Because the powers to contract and purchase, sought to be conferred by said act upon said Detroit Street-Railway Commission, cannot be either conferred upon or exercised by said commission, under said Constitution.

"5. Because said act attempts to clothe said Detroit Street-Railway Commission with legislative powers as to street railways, and the operation and management of the same.

"6. Because said act is an unlawful interference with the rights of local self-government vested by said Constitution in the citizens of said city, in that it undertakes to take out of the control of the common council and board of estimates of said city the several matters of purely local concern above mentioned, and vest the same in the said Detroit Street-Railway Commission, which is a body the members of which hold their offices for long, appointive terms, are a law unto themselves, and are subordinate and responsible neither to said citizens nor to their representatives, in any manner or form."

Is the act contrary to section 9, art. 14, of the Constitution?   The section reads as follows:

" The State shall not be a party to, or interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property."

It is doubtless true, as urged by counsel, that the State legislature is given a general grant of legislative power, and that its power to legislate is subject only to such limitations as are imposed thereon by the express or implied limitations contained in the Constitution of the State or the Constitution of the United States. To understand the force and effect of the provisions of our Constitution in relation to the attitude of the State towards internal improvements, it may be well to consider the experience of other States and of our own State prior to the adoption of our present Constitution. The war of 1812 demonstrated the great need of a better system of intercommunication between the various portions of the country. The condition of the highways, both land and water, was such that troops and provisions could be moved but slowly and at great expense. This was also true of the products of the country. Succeeding the war of 1812, the State of New York entered upon the construction of the Erie Canal. Its construction was doubtless of great benefit to the agricultural and commercial interests of the State, and especially to the city of New York. Other States were prompted to follow the lead of New York, and projected the digging of canals, the improvement of waterways, and the construction of railroads. Nearly all the State Constitutions adopted between 1830 and 1850 either gave the legislature permission, or made it mandatory, to "encourage internal improvements within the State." Many enterprises of this character were entered upon which were ill-advised. So many of them were undertaken, many of the States incurred obligations they were unable to meet. The rate of interest in these new countries was much higher than capital commanded in Europe. Money from there after 1830 was furnished almost without limit, to be invested in the various projects devised by the several

States.    The State debts increased from $13,000,000 in 1830 to $100,000,000 in 1838.    After the financial crisis of 1837 came, foreign capitalists who sought to draw out this money were unable to do so.    An effort to collect these obligations proved abortive.    Upon one pretext or another, many of the States repudiated their debts made for internal improvements.    The States most disastrously affected were Maryland, Pennsylvania, Indiana, Illinois, Louisiana, Mississippi, and our own State.    2 Cycl. Pol. Science, 571.

For the period between 1835 until the financial panic of 1837 occurred, the State of Michigan had a wonderful growth.    The opening of the Erie Canal, and the facilities for travel furnished by the Great Lakes, made it comparatively easy for the residents of New York, New Jersey, and New England who were seeking to better their condition to reach our borders.    The climate was good, and the soil was fertile.    The example of New York in constructing works of internal improvement was thought worthy of imitation.    The Constitution adopted upon the admission of the State into the Union provided:

" Internal improvement shall be encouraged by the government of this State; and it shall be the duty of the legislature, as soon as may be, to make provision by law for ascertaining the proper objects of improvement in relation to roads, canals, and navigable waters, and it shall also be their duty to provide by law for an equal, systematic, economical application of the funds which may be appropriated to these objects."    Const. 1835, art. 12, § 3.

The governor of the new State, in a message to the legislature, called its attention to its duty to act under the constitutional provision.    The legislature was not slow to respond.    A canal was projected from Mt. Clemens to the mouth of the Kalamazoo river, and one around the falls of the St. Mary.    A number of State railroads were surveyed, and their construction entered upon.    To meet the expense, the governor was authorized to borrow, upon State bonds issued for the purpose, $5,200,000.    These bonds were all negotiated, though, owing to the failure of one of

the companies and one of the banks which undertook to negotiate them, the amount for which they were negotiated never found its way into the State treasury. It became evident the amount of the loan would not begin to complete the internal improvements already begun. Then came the financial panic. Bankruptcy and financial ruin were upon every hand. The State, at a great sacrifice of its property, made an arrangement with its creditors which left its credit good, but left it very badly in debt. Cooley, Hist. Mich. 279; Camp. Hist. Mich. 495.

As the result of this experience, the State had the canal at the St. Mary's river, which was afterwards taken over by the Federal Government, and is now one of the most important improvements upon the Great Lakes; a short section of a canal, which has never been of any use, except to furnish water-power to private parties; and some uncompleted railroads, which the people were glad enough to have sold to private corporations. Justice COOLEY states the situation in detail (Cooley, Hist. Mich. 289):

"The works of internal improvement still remained on the hands of the State, and in the day of its poverty and trial they were continually calling upon a depleted treasury for money to keep them in ·progress. But, now that the great bubble of speculation and inflation was burst, it became plain to the comprehension of the dullest that some of the State projects were wild and chimerical, and they were abandoned altogether. Such was the case with the projected canal from Mt. Clemens to the mouth of the Kalamazoo river, which it was now seen would be worthless if constructed. The only works of much promise were the Central and Southern of the three railroads, which were now very well under way. But doubts were arising in the minds of the people whether the State had been wise in undertaking the construction and management even of these,—whether it was possible for the State to do either the one or the other with the same prudence and economy as could private owners. These doubts soon matured into a settled conviction that the management of railroads was in its nature essentially a private business, and ought to be in the hands of individuals. By common consent it came to be considered that the State, in entering upon these works, had made a serious mistake; and the legislature, in an act for funding the loan bonds, invited proposals from State creditors for the purchase of the State

railroads.    The times were not then propitious; but in 1846 the Central and Southern Railroads, so far as they were then constructed, were sold by the State to corporations which had been chartered for the purpose of purchasing. The aggregate price was two millions and a half,—a sum very much below what had been their cost to the State. But the people felt that the roads were well off their hands, and, as has been said by one familiar with the whole history: 'Here virtually ceased to exist all our works of internal improvement.    Nothing but the *debris* of our airy castles remained, and that only to plague our recollections.'    The two great railroads, when taken up by corporations, went rapidly forward to completion; and they soon became great national highways, whose utility to the State was quite equal to the highest expectations ever formed concerning them.

"Having all their bitter experience with internal improvements fresh in mind, when they formed a new Constitution, in 1850, the people resolved to put it out of the power of the legislature again to involve them in extravagant projects.    And here we reach another landmark, significant in itself, but especially notable when contrasted with the provision respecting internal improvements which has already been quoted from the Constitution of 1835. In 1850 the people deemed it necessary to prohibit what in 1835 they commended, and they now provided that 'the State shall not subscribe to, or be interested in, the stock of any company, association, or corporation,' and also that 'the State shall not be a party to, or interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property.'    These were very positive provisions, and by adopting them the people believed they had rendered it impossible that projects of doubtful wisdom and utility should be engaged in at the public cost.

"But diseases in the body politic, like those in the human system, are likely to take on new forms from time to time, and they are not to be exorcised by words or kept off by constitutional inhibitions.    The mania for internal improvements at the cost of the public, when it returned 15 years later, under the administration of Gov. Crapo, took on the form of aid to railroad corporations by the several municipal bodies in the State.    Such aid was being given in other States, and railroads, as a consequence,

were being constructed with a rapidity never paralleled. Michigan was lagging behind the rest of the country. Why should this be so? Every town which should subscribe to the stock of a railroad would immediately receive a full return in the enhanced value of its landed property, and would have the stock besides. This was what was commonly said and commonly believed; and the legislature, well reflecting the common desire, passed a general law under which townships and cities were to be permitted to vote aid to railroads. The railroads, under another general law, might be laid out anywhere by the projectors, at pleasure, so that monopoly in these public conveniences seemed to be effectually provided against. The governor vetoed the railroad-aid act, but the legislature passed it over his veto. The business of voting aid to railroads was soon active, and the most visionary scheme was found as likely to receive aid as any other,—perhaps more so, for more work would be done for it. Nothing is so easy as to build railroads, if it can be accomplished by dropping votes into a box. Only fossils and croakers will disturb the public mind by reminders that the sums voted must at some time be paid, and that the roads, when built, may pay nothing towards them. The State, in detail, by its corporations, was fast plunging into indebtedness, which had already reached an aggregate of several millions, when the process was arrested by a decision of the State Supreme Court that the act under which the voting had taken place was unconstitutional. The decision was a bitter disappointment to many, and the public clamor for a time was loud and earnest; but a movement to obtain an amendment to the Constitution which would permit such municipal aid to railroads was unsuccessful, and the excitement soon died out. The people had taken the 'sober second thought,' and had become convinced that municipal corporations, in their power to contract debts or to expend public moneys, should be confined closely to proper municipal purposes. And this conclusion may be taken as a third conspicuous landmark in the history of internal improvements in Michigan."

The cases referred to by Justice COOLEY were *People* v. *Township Board of Salem*, 20 Mich. 487 (4 Am. Rep. 400); *People* v. *State Treasurer*, 23 Mich. 499; and *Thomas* v. *City of Port Huron*, 27 Mich. 320.

We think it may fairly be said of the case of *People* v.

*Township Board of Salem* that the opinion was rendered upon the ground that the tax proposed would be levied for a private rather than a public purpose. This, however, cannot be said of the case of *People* v. *State Treasurer.* In the last-named case it was held that the construction of the railroad was an internal improvement, within the meaning of the Constitution, and that what the State could not do, it could not authorize the townships and cities to do. The language of the opinion is not susceptible of any other construction. It is very clear from what has been quoted from the history of Michigan, written by Judge COOLEY, and published in 1885, that he so construed the decisions cited. The language of the opinion is as follows:

"Our State had once before had a bitter experience of the evils of the government connecting itself with works of internal improvement. In a time of inflation and imagined prosperity, the State had contracted a large debt for the construction of a system of railroads, and the people were oppressed with heavy taxation in consequence. Moreover, for a portion of this debt they had not received what they bargained for, and they did not recognize their legal or moral obligation to pay it. The good name and fame of the State suffered in consequence. The result of it all was that a settled conviction fastened itself upon the minds of our people that works of internal improvement should be private enterprises; that it was not within the proper province of government to connect itself with their construction or management; and that an imperative State policy demanded that no more burdens should be imposed upon the people by State authority for any such purpose. Under this conviction they incorporated in the Constitution of 1850, under the significant title of 'Finance and Taxation,' several provisions expressly prohibiting the State from being a party to, or interested in, any work of internal improvement, or engaged in carrying on any such work, except in the expenditure of grants made to it, and also from subscribing to, or being interested in, the stock of any company, association, or corporation, or loaning its credit in aid of any person, association, or corporation. Article 14, §§ 7-9. All these provisions were incorporated by the people in the Constitution as precautions against

injudicious action by themselves, if in another time of inflation and excitement they should be tempted· to incur the like burdensome taxation in order to accomplish public improvements in cases where they were not content to wait the result of private enterprise.   The people meant to erect such effectual barriers that, if the temptation should return, the means of inflicting the like injury upon the credit, reputation, and prosperity of the State should not be within the reach of the authorities.   They believed these clauses of the Constitution accomplished this purpose perfectly, and none of its provisions had more influence in recommending that instrument to the hearty goodwill of the people."

The doctrine of these cases was again affirmed in *Thomas* v. *City of Port Huron*, 27 Mich. 320.   These cases all hold that what the State cannot do itself cannot be done through the aid of inferior municipalities.  ·

Counsel urge that the doctrine announced in *People* v. *Township Board of Salem, People* v. *State Treasurer*, and *Thomas* v. *City of Port Huron* was never accepted as correct by the profession in this State, and is contrary to the decisions of other courts.   If we understand the logic of the argument, it is that those cases should be overruled.   We have had occasion recently .to consider a contention of like character, and supposed we had so · clearly expressed ourselves that the doctrine of those cases could no longer be questioned.   We do not deem it necessary to repeat what was said upon that subject in *Dodge* v. *Van Buren Circuit Judge*, 118 Mich. 189.

Counsel suggest it is as competent to authorize the city to own and operate a street railway as to acquire and maintain a public park, waterworks, a lighting plant, or a fire department, or to construct drains or to build sewers. It may be somewhat difficult to draw the line as to what a municipality may properly do and what it may not do, but all the things above mentioned are authorized and defended because it is a proper exercise of the police power. An adequate supply of water is needed for protection against fire.   1 Dill. Mun. Corp. (4th Ed.) §§ 144, 146.

"There can be no matter of higher public concern to every city than the supply of pure and wholesome water for all useful purposes; and as population becomes more and more compact, and cities grow, the ability of the individual member of the municipal corporation to supply his individual wants in that direction constantly diminishes, and in all the larger places it becomes a matter of absolute public necessity that the city itself should directly or indirectly provide the supply. Nothing else so directly and materially affects the health of the community as the character of its water supply." Prent. Police Powers, 303. Drains and sewers and parks are all needed in the interest of public health. 2 Dill. Mun. Corp. (4th Ed.) § 598; *Kinnie* v. *Bare*, 68 Mich. 625; Prent. Police Powers, 56, 131, 242. Lighted streets tend to the prevention of crime. Police powers have their origin in the law of necessity. Id. 4. The exercise of these powers has little in common with what is sought to be done here.

It is urged that the internal improvements contemplated by the Constitution must be of sufficient magnitude to concern the people of the State (citing *Sparrow* v. *Commissioner of State Land Office*, 56 Mich. 575), and that street railways are mere local improvements, or a strictly local interest, not known at the time the Constitution was framed, and are not such improvements as are contemplated by the phrase "internal improvements" (citing *Detroit Citizens' St. Ry. Co.* v. *City of Detroit*, 12 C. C. A. 365, 64 Fed. 628; *Detroit City Ry.* v. *Mills*, 85 Mich. 634). It is not claimed these cases are directly in point, but that some statements contained therein lead to the conclusion just stated. The questions involved in this case were not at issue in the cases cited, and the opinions do not tend, in our judgment, to support the contention of counsel. We shall have occasion later to consider whether the improvements are of sufficient magnitude to be deemed internal improvements.

It is said, if the theory of the relators is sound, the city of Detroit cannot construct a macadamized road, or pave

a street, or build a sewer. It is a complete reply to this
suggestion to call attention to the fact that by sections 23
and 38 of article 4, and section 1 of article 11, the Consti-
tution has given to townships the control of highways,
and to the cities and villages the control of the streets, for
all purposes germane to their use.

It is said that, while steam railroads are in a sense public
highways, in another and legal sense they are not public
highways, but that street railways are in every proper
sense public highways, public utilities of a local character,
and are not internal improvements, within the meaning of
our Constitution. Our attention is called to the case of
*Sun Printing, etc., Ass'n* v. *Mayor, etc., of New York*,
152 N. Y. 257 (37 L. R. A. 788), as sustaining this conten-
tion. It is true, that case holds that it is within the legisla-
tive power to authorize the city to construct a street railway
under the streets of New York, and, when constructed, to
lease it for not less than 35 nor more than 50 years, at a
rental not less than the interest paid by the city for the
construction, and 1 per cent. in addition. The writer of
the prevailing opinion stated that the case was not free
from difficulty, and the court considered the case, "hoping
to reach a result that will afford necessary relief to the
people of the city and at the same time preserve the gen-
eral policy of our system of government." It appears in
that case that, pursuant to the provisions of the act, the
commissioners entered upon their duties, and located a
road to be built under the streets, through the main
portions of the city, and then tried to induce private cap-
italists to undertake its construction. No private capital-
ists were willing to undertake the construction of the road,
and it was undertaken by the commissioners for the city.
In the course of the discussion, reference is made to certain
cases decided by the Ohio court, and this language is used:

"We do not understand that the views above expressed
are in conflict with the Ohio cases. In that State the
constitution does not limit municipal expenditures to 'a
city purpose.' We do not, however, wish to be under-

stood as approving of those cases, especially in so far as they sustain the right of a city to construct a railroad mainly outside of its own territory and state."

In conclusion, the opinion is as follows:

" Our government was established by the people for their own protection and welfare. Their policy was to foster and protect individual industry and enterprise. To such policy we owe our advancement as a nation, and to such we must look for our future prosperity. The constitution should be construed with reference to this general policy, and ordinarily railroads should be constructed and operated by private capital. The situation, however, in the city of New York, is most peculiar. A long, narrow island lies between two rivers,—so narrow in places that there are practically but two or three streets through which the masses must reach its business center. The population of the city during the last half century has increased from three hundred thousand to over a million and a half of people. The travel upon its existing railroads during the last twenty years has increased from one hundred and fifty millions in 1874 to upwards of four hundred and forty-eight millions in 1894. It was conceded upon the argument that the crowded and congested condition of the travel upon the streets in the city renders the proposed structure necessary. These considerations have induced us to give to the provisions of the act a most liberal construction. The commissioners located the road, and tried to induce private capital to construct and operate it. In this they have failed, and the situation is such that the city must itself construct the road, or go without it. Here we have a demand for a great public highway, which private enterprise and capital will not construct. It is necessary for the welfare of the people, and is required by them. It is public in character, and is authorized by the legislature. Our conclusion is that, under the circumstances and situation here presented, the proposed road may properly be held to be ' for a city purpose,' and that the acts are not in contravention of the provisions of the constitution."

The doctrine stated in the Ohio case cited (*Walker* v. *City of Cincinnati*, 21 Ohio St. 14 [ 8 Am. Rep. 24] ) is contrary to the holdings of this court, as has already been shown, and cannot be reconciled with the later cases of

*Taylor* v. *Commissioners of Ross Co.,* 23 Ohio St. 22; *Wyscaver* v. *Atkinson,* 37 Ohio St. 80; and *Counterman* v. *Township of Dublin,* 38 Ohio St. 515.   It is evident that the conclusion reached in the prevailing opinion is based upon the ground that because of the crowded condition of the city, and its peculiar shape, the improvement was a necessary one, and that, as private capital and enterprise would not enter upon its construction, it was lawful to authorize the city to do so.   None of the conditions existing in New York, justifying the city, if it was justified, in entering upon the construction of the road, exist in Detroit.   The city is already well supplied with means of transit, and, if abuses exist in the management, the authorities have ample power to correct them.   The dissenting opinion in the case is more in harmony with the law in this State than is the prevailing opinion.

We are not entirely without light in relation to what constitutes an internal improvement, within the meaning of the Constitution.   We have already seen that steam railroads come within the category.   In the case of *Ryerson* v. *Utley,* 16 Mich. 269, it was held that an attempt to improve the navigation of the Muskegon river by removing therefrom sand flats came within the constitutional inhibition.   In *People* v. *Township Board of Springwells,* 25 Mich. 153, it is said that a macadamized road is a work of internal improvement.

"The shortness of the road does not change its character.   The restriction is not against great works, but against all works of that kind, and the case comes within the language and intent of the prohibition."

The court held that work of that character must be done by the local authorities, because, under the Constitution, they had been intrusted, as we have already stated, with the care of the highways.

In *Anderson* v. *Hill,* 54 Mich. 477, it was held that a township could not be authorized to vote money to aid in deepening or straightening the Dowagiac river, because it was an internal improvement.   The court said:

"That the straightening or otherwise deepening the channel of the Dowagiac river, in Van Buren county, expresses a work of internal improvement, needs no argument. * * * If the legislature has the authority to pass a law permitting the majority of the legal voters of a particular township to impose a tax to aid the State in the work of an internal improvement, it has the authority to impose such by direct enactment, without the intermediate step of a vote of the people, and against their wish; and the rule is well settled, if it has not the power to impose such tax directly, it cannot authorize the imposition of the tax indirectly, through a vote of the municipality or people."

In *Sparrow* v. *Commissioner of State Land Office,* 56 Mich. 567, it was held that straightening and opening the channel of Cedar river was an internal improvement, though the decision was put upon another ground. Justice CAMPBELL used this language:

"There can be no doubt of its being a work of internal improvement. That phrase is as broad as language can make it. It can make no difference for what direct or indirect purpose of public utility an improvement is made, so long as it comes within such a definition, and it can make no legal difference over how much of the State it passes. All works of convenience, whether for travel, drainage, or irrigation, are similar in their nature when small and large, and works for all of these purposes have been made of all dimensions, and for large and small districts. It is impossible to draw any line of magnitude. Any such work that is deemed important enough for the State to construct is within the rule, and, if not built in the permitted way, is within the prohibition."

Justice CHAMPLIN agreed with this statement, while Justice COOLEY said he did not intend to question the correctness of the decision in *Ryerson* v. *Utley* and *People* v. *Township Board of Springwells.*

In *Wilcox* v. *Paddock,* 65 Mich. 23, it was held that the straightening and deepening of Maple river was an internal improvement, within the meaning of the Constitution.

The constitution of Minnesota has a provision that "the

State shall never contract any debts for works of internal improvement, or be a party in carrying on such works." Const. Minn. art. 9, § 5. A bill was passed providing for a board of railway and warehouse commissioners, who were authorized to erect a State warehouse or elevator at Duluth, for public storage of grain. This was held to come within the constitutional inhibition, and the learned judge enters upon an extended discussion of what constitutes internal improvements, and the authorities relating thereto. It is too long to insert here. This language is used in the opinion:

"The time was when the policy was to confine the functions of government to the limits strictly necessary to secure the enjoyment of life, liberty, and property. The old Jeffersonian maxim was that the country is governed the best that is governed the least. At present the tendency is all the other way, and towards socialism and paternalism in government. This tendency is perhaps to some extent natural, as well as inevitable, as population becomes more dense, and society older and more complex in its relations. The wisdom of such a policy is not for the courts. The people are supreme, and, if they wish to adopt such a change in the theory of government, it is their right to do so. But in order to do it they must amend the constitution of the State. The present constitution was not framed on any such lines." *Rippe* v. *Becker*, 56 Minn. 100.

When the reasons arose for placing in the Constitution the provisions in relation to internal improvements, judged from our standpoint, the railroads were imperfect. Their passenger cars were not much heavier than the large stage coaches, and would carry from 18 to 24 passengers. In many instances the rails were flat bars of iron, less than an inch thick, laid upon rails of wood, and kept in place by spikes. The roadbeds were not well graded nor heavily ballasted. The locomotives weighed from two to six or seven tons. Cars were passed over the steeper grades by counterweights of box-cars, weighted with stone, which balanced them like window weights balance window sash. As there were no long railways, there was no freight-

ing, except light articles, for any considerable distance. The rolling stock was cheap and scanty. Great weight and great speed would have destroyed the tracks. The entire cost of building what is known as the "Michigan Central Road," to Marshall, was about $2,000,000, and it is probable the value of all internal improvements entered upon by the State was less than $5,000,000. Camp. Hist. Mich. 484.

The pleadings show that the various street-railway companies own and operate in Detroit 141 miles of street railways, which the respondents propose to take over. If the tracks inside the car barns and abandoned tracks be added, the single-track mileage is about 179 miles. There is a bonded debt upon these roads of upwards of $10,000,000, and their property is regarded as worth between $5,000,- 000 and $17,000,000. It is currently reported that the commission propose to pay upwards of $16,000,000 for this property, besides assuming its indebtedness. By virtue of agreements made between these companies, there are run on their lines in Detroit cars owned by other companies, which start from Pontiac, Oakland county; Mt. Clemens, in Macomb county; Ann Arbor, in Washtenaw county; and the city of Wyandotte, in Wayne county. The tracks of these roads are laid in a very substantial manner. The cars of the outside roads will accommodate 50 to 75 passengers each, are of great size, and run at frequent intervals. It is a matter of common knowledge that over some of these lines cars marked "special" are now run at frequent intervals, carrying freight. An electric road is now projected from Ann Arbor to Lansing, and from other of the lines now reaching Detroit to various points in the interior of the State. This method of transit, or some improvement thereon, is yet in its infancy. It does not require one with the ken of a prophet to see that in the near future the villages and cities of the State will be connected with a network of methods of rapid transit.

By the terms of the act (section 5), it is provided that—

"The said commission may in their discretion, and upon such terms and conditions as they may deem advisable for the interests of said city, acquire, by deed, lease, or other satisfactory conveyance from the company or companies owning the same to said city, any street railway or railways existing at the time of the passage of this act, and lying wholly within or partly within and partly without said city, operated by the same company or companies, together with the property, assets, rights, privileges, etc., owned and used in connection with or pertaining to said railways, including rights to routes belonging to such company or companies upon which a railway shall not be in operation, and may operate and maintain said street railways so acquired, for the carriage of passengers and freight for hire."

Section 8 provides that, after acquiring any railway pursuant to section 5, the "commission shall have the power to enter into agreements with any street-railway company, having a line of street railway, for or in relation to the exchange of tickets and transfers, and for the carriage of passengers, use of tracks, or operation of cars," provided such agreements shall not be contrary to the provisions of section 5.

It is stated in the brief of one of the counsel for respondents that during the past year the railways of Detroit carried 45,000,000 passengers. The steam roads of 1850, crude as they were, provided improved methods of moving passengers and freight over what had before been in vogue. The electric roads of 1899 are still greater improvements for the same purpose. The rails used by the electric railway are much heavier and more substantial. The track is much more substantial than those used prior to 1850. The cars will accommodate three or four times as many people. The transit is much more rapid. The entire cost of all the improvements entered upon by the State would not amount to one-half the amount which the record discloses the commissioners expect to pay for the property they intend to take. To say the system of railroads as it existed in 1850 constituted internal improvements, within the meaning of

the Constitution, and that the system of roads existing in Detroit, which are to be taken over by this commission, and the lines leading thereto, with which said commission are allowed to make agreements for deeds, leases, and in relation to the exchange of tickets and transfers, is not a system of internal improvements, within the meaning of the Constitution, is to deny to words in common use their ordinary and accepted meaning. If the legislature may authorize the city of Detroit to enter into the proposed arrangement, it may authorize any other municipality to do so, and, by concert of action between the various municipalities, they may cover the State with means of rapid transit, owned and operated by the municipalities. This would enable the State to do, by means of agencies called into being by itself, what it cannot itself do, and what the Constitution forbids its doing.

It is said that the Constitution was adopted a long while ago, and that this is a gigantic age, in which enterprises are being formed on a scale so vast as to be almost beyond comprehension, and the Constitution ought to be given a construction in keeping with the spirit of the age. This argument is more properly addressed to the people than to the courts. Constitutions do not change as public opinion changes. Their provisions do not mean one thing one day and another another day. The written Constitution is the most solemn declaration of the people in relation to the powers of State. It was drawn by their representatives selected especially for that purpose. It had their approval at the polls. Every officer of every kind in the State is required to take an oath to support it, before he can enter upon the duties of his office. It is not a pleasant duty to declare that a law passed by the legislature and approved by the governor is not valid. When such a law is enacted, courts cannot for a moment hesitate in performing that duty, disagreeable as it is. The provisions of the Constitution involved in this controversy have been in existence for nearly half a century. As we have already shown, they were construed along the lines of this

decision nearly 30 years ago. The people of the State have not indicated in the way provided by the organic law any dissatisfaction with these provisions. The courts cannot substitute their judgment of what the Constitution ought to be for what the people have made it. Its provisions must remain and control until the people see fit to change them in the way provided by the Constitution itself. *McPherson* v. *Secretary of State,* 92 Mich. 377 (16 L. R. A. 475, 31 Am. St. Rep. 587).

It is not necessary to discuss the very serious question whether a commission could be authorized to buy from five to eighteen million dollars' worth of property, and subject the city of Detroit to the liability growing out of the operation of upwards of 100 miles of electric street railways, without giving the citizens and taxpayers an opportunity to say whether they wanted to purchase and operate such a business or not, nor is it necessary to discuss the other questions raised by counsel; for, if we are right in our conclusion that the law is unconstitutional, this disposes of the case.

We were asked by one of the counsel, in his oral argument, whatever our decision in this case might be, to decide the question whether the city, under any circumstances, may build or buy lines of street railway in its streets, all lying within the city limits, and lease them upon such terms as the city authorities shall deem to be for the best interests of the citizens. It is not necessary to pass upon the question just stated in order to dispose of this case. The law under consideration involves much more than the simple question of municipal ownership of the tracks within the corporate limits, and, in the decision of the case before us, we do not deem it wise to express any opinion upon any question other than the one before us. It will be soon enough to pass upon the other question when it is necessarily before the court, and when the court can have the benefit of the conditions and surroundings then existing.

We think the law unconstitutional, that there is no such

office as the "Detroit Street-Railway Commission," and that respondents have no title thereto, and that judgment of ouster should be entered.

The other Justices concurred.